# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Dolores Frederick, Patricia Hagaman, and Beverly Taylor, | : | |
| Appellants | : | |
| | : | |
| v. | : | |
| | : | |
| Allegheny Township Zoning Hearing Board | : | |
| | : | |
| v. | : | |
| | : | |
| CNX Gas Company, LLC | : | |
| | : | |
| v. | : | |
| | : | |
| Allegheny Township | : | |
| | : | |
| v. | : | |
| | : | |
| John H. Slike and Anne E. Slike, Northmoreland Farms LP | : | |
| | : | |
| v. | : | No. 2295 C.D. 2015 |
| | : | Argued: February 7, 2018 |
| Michael Golembeiwski and Lisa Golembeiwski, John P. Brunner, II, Esq., Jeffrey and Sheila Brunner, Miller Niksic, Joanne Resh, Richard and Patricia Trumble, Michael and Jacalyn Schumaker | : | |

BEFORE:   HONORABLE MARY HANNAH LEAVITT, President Judge
          HONORABLE RENÉE COHN JUBELIRER, Judge
          HONORABLE P. KEVIN BROBSON, Judge
          HONORABLE PATRICIA A. McCULLOUGH, Judge
          HONORABLE ANNE E. COVEY, Judge
          HONORABLE MICHAEL H. WOJCIK, Judge
          HONORABLE ELLEN CEISLER, Judge

OPINION BY
PRESIDENT JUDGE LEAVITT                                    FILED: October 26, 2018

        Dolores Frederick, Patricia Hagaman, and Beverly Taylor (collectively, Objectors) appeal an order of the Court of Common Pleas of Westmoreland County (trial court) that affirmed the decision of the Allegheny Township Zoning Hearing Board (Zoning Board) to deny Objectors' land use appeal. In that appeal, Objectors raised a substantive validity challenge to Zoning Ordinance 01-2010,[1] which supplemented the Township's Zoning Ordinance[2] to allow oil and gas well operations in all zoning districts so long as they satisfy enumerated standards designed to protect the public health, safety and welfare. Pursuant to Zoning Ordinance 01-2010, the Township issued a permit to CNX Gas Company (CNX) to develop an unconventional gas well on property located in the Township's R-2 Agricultural/Residential Zoning District (R-2 Zoning District). Objectors assert that Zoning Ordinance 01-2010 improperly instituted illegal spot zoning in violation of substantive due process; does not comport with the Environmental Rights Amendment in Article I, Section 27 of the Pennsylvania Constitution; and contravenes several provisions of the Pennsylvania Municipalities Planning Code (MPC).[3] Consequently, Objectors contend, the CNX permit was improperly issued. After review, we affirm.

### Zoning Ordinance 01-2010

        On December 13, 2010, the Township enacted Zoning Ordinance 01-2010, entitled "Providing for the Zoning of Oil and Gas Drilling Operations." Reproduced Record at 203a-12a (R.R. __). Zoning Ordinance 01-2010 makes oil and

---

[1] TOWNSHIP OF ALLEGHENY, WESTMORELAND COUNTY, ORDINANCE NO. 01-2010 (Zoning Ordinance 01-2010), enacted December 13, 2010, effective December 18, 2010.

[2] ALLEGHENY TOWNSHIP ZONING ORDINANCE, §§250-1 to 250-155, adopted June 16, 1997, by Ordinance No. 11-1997, *as amended*.

[3] Act of July 31, 1968, P.L. 805, *as amended,* 53 P.S. §§10101-11202.

gas development "a permitted use by right in all Zoning Districts[,]" subject to numerous standards, or conditions. Section 3 of Zoning Ordinance 01-2010; R.R. 205a. These standards, *inter alia*, relate to road safety; the clearing of brush and trees; emergency planning; dust, noise and lighting controls; and security measures.

More specifically, Zoning Ordinance 01-2010 requires gas well operators to give residents within 1,000 feet of the well: a copy of the survey plat; a description of the planned operations; contact information for the operator; and the opportunity to meet with the operator. It requires the installation of a chain link fence and warning signs at the well site and the posting of a security guard whenever a drilling rig is present. It limits the hours for site preparation and construction as well as the ambient noise levels. It requires the operator to maintain a copy of the material safety data sheets for all chemicals used in drilling operations on-site and to provide a copy to the Township's manager. It prohibits the on-site disposal of refuse or burning of brush during clearing of the site. It requires operators to mitigate any problems they cause, including the disruption of telephone, cell phone, and other signals.

Zoning Ordinance 01-2010 requires gas well operators to comply with all federal and state permitting requirements. Operators must produce these permits 10 days before construction. Notably, a permit from the Pennsylvania Department of Environmental Protection (DEP) requires compliance with the setbacks of gas and oil wells from water wells and buildings set forth in the statute known as "Act 13." *See* 58 Pa. C.S. §3215(a). Notwithstanding the decision of our Supreme Court holding that certain provisions of Act 13 were unconstitutional, these setbacks remain in effect. *Robinson Township v. Commonwealth*, 147 A.3d 536, 542 n.3 (Pa. 2016) (*Robinson*

2

*Township IV*).[4] Operators must also obtain permits from the Pennsylvania Department of Transportation (PennDOT).

Zoning Ordinance 01-2010 establishes civil penalties for violations of its terms.

## Background

On October 6, 2014, the Township issued a "zoning compliance permit" to CNX to develop an unconventional gas well on property located in the R-2 Zoning District. The property is owned by Northmoreland Farms, LP, which has three members, John H. Slike, his wife, Anne E. Slike and their son, Neil Slike. CNX's gas well is known as the Porter Pad project.

Objectors, who live near the Slike property, filed a substantive validity challenge to Zoning Ordinance 01-2010, arguing that an unconventional gas well is not a use compatible with an agricultural-residential use. Objectors also appealed the permit issued to CNX. The Zoning Board held public hearings on Objectors' filings on January 7, 2015; January 28, 2015; February 11, 2015; and March 5, 2015.[5]

Objectors presented the testimony of Dr. John Stoltz, Professor of Biology at Duquesne University and Director of the Center for Research and Education.[6] Dr. Stoltz testified about his general understanding of drilling and the hydraulic fracturing process. Dr. Stoltz stated that CNX's drilling would impact water wells; however, he

---

[4] The Township's Zoning Ordinance contains "area and bulk regulations" that apply to uses in multiple zoning districts. *See, e.g.,* ALLEGHENY TOWNSHIP ZONING ORDINANCE, §250-24 (setting forth minimum lot sizes and yards in the R-2 Zoning District).

[5] In addition to the Slikes and Northmoreland Farms, LP, other Township residents interested in leasing their property for gas exploration intervened in the hearing. They include: Michael Golembeiwski; Lisa Golembeiwski; John P. Brunner, II, Esquire; Jeffrey Brunner; Sheila Brunner; Miller Niksic; Joanne Resh; Richard Trumble; Patricia Trumble; Michael Schumaker; and Jacalyn Schumaker.

[6] The Board did not qualify Dr. Stoltz as an expert.

conceded that he had no knowledge of the location of wells or public water sources in the Township and had not realized that the Porter Pad project would not use water from streams but, rather, public water sources. Dr. Stoltz testified that onsite burial of waste is problematic; he was unaware that CNX did not plan to bury waste at the Porter Pad site. Finally, Dr. Stoltz opined that truck traffic would increase at the site because CNX will need to drain the condensate tanks. Dr. Stoltz did not know how much condensate would be generated or what type of gas would be extracted at the Porter Pad; he agreed that "dry gas" does not present condensation issues. Notes of Testimony (N.T.), 1/7/2015, at 88; R.R. 331a.

Objectors also presented the testimony of Steven Victor, who was qualified to testify as an expert in land use planning and landscape architecture. Victor testified that 85 percent of the Township lies in the R-2 Zoning District. Victor opined that oil and gas drilling could be compatible with other uses in the R-2 Zoning District, but he believed that "stronger standards and regulations" were needed in Zoning Ordinance 01-2010. N.T., 1/28/2015, at 75; R.R. 537a. Victor opined that Zoning Ordinance 01-2010 did not adequately protect the local water supply; limit noise; or reduce light pollution. Victor was unsure what protections would be adequate. He did not know whether numerous environmental protection laws, such as those enforced by DEP, would address his listed concerns.

Objectors also testified. Beverly Taylor stated that she chose her residence for its quiet, rural setting. Her property lies approximately 1,000 feet away from the well and 700 feet from the perimeter of the site. Taylor testified that CNX used heavy machinery from approximately 6:30 a.m. until dusk seven days per week to prepare the site by removing trees, clearing ground, and constructing roadways. Eventually the work was reduced to six days per week.

4

Objector Dolores Frederick testified that she lives approximately 900 feet from the Porter Pad project. She also complained about the noise during the clearing process, as well as the traffic inconvenience caused by the trucks, which left mud and dirt on the roads.

Objector Patricia Hagaman's home is located approximately 1,200 feet away from the Porter Pad site. She cannot see the site from her house, but can hear the "beeps [of the trucks because she lives] in a valley." N.T., 1/28/2015, at 117; R.R. 579a. She expressed concern that a stream flowing across her property would be polluted. Hagaman testified that if development continues, she will try to sell her property because it will be "too dangerous" to stay. N.T., 1/28/2015, at 121; R.R. 583a.

Kevin Zigler,[7] who lives approximately 625 yards from the Porter Pad, testified that two people, one a realtor, advised him that the Porter Pad project will reduce his property's value. Zigler believed the devaluation would be substantial. He complained about the noise from trucks and the mud they tracked onto the roads. Zigler acknowledged that in 2014, he signed a lease with another gas company, Huntley and Huntley, for the drilling of a horizontal line under his property to extract gas.

CNX presented the testimony of Kyle Stefanick, a senior land agent with Consol Energy,[8] who is responsible for leasing land for well pads, pipelines and rights-of-way for gas exploration. Stefanick stated that the Township encompasses approximately 20,000 acres of land, of which 12,500 acres have been leased to "various" natural gas exploration companies. N.T., 2/11/2015, at 59; R.R. 741a. Seventy-five percent of the land in the R-2 Zoning District has been leased for natural gas drilling.

---

[7] Zigler is not a party to this appeal.

[8] CNX is a subsidiary of Consol Energy.

5

Stefanick testified that there are approximately 242 gas wells in the Township, all of which are conventional.[9]  The Porter Pad will be the first unconventional well in the Township.  However, it will not be the first gas well in the Township to be opened by hydraulic fracturing because conventional well developers, including some in the Township, also employ hydraulic fracturing.

Stefanick testified that six wells are proposed for the Porter Pad.  He noted that the Slikes' farm already has three gas wells that are plainly visible to persons driving by the property.  During drilling, the only apparatus that will be visible from the Taylor property, which is closest to the well site, is the derrick.  Once drilling is complete, the derrick will be removed, and nothing will be visible.  Stefanick testified that there is an existing gas well 320 feet from the Taylor property that was drilled in 1947 and another 842 feet away that was drilled in 1996.  Stefanick observed that there is an existing well 509 feet from the Hagaman residence that was drilled in 1960.

Ted Szalewicz, a land agent and consultant for Western Pennsylvania Gas Leasing Consultants, testified for CNX.  He testified that his search of the Westmoreland County Recorder of Deeds Office revealed that "approximately 400 leases" were recorded in the county in 2014, encompassing "approximately 4,000 acres of land[.]" N.T., 2/11/2015, at 116; R.R. 798a.  The rental payments on the leases filed in 2014 totaled "about $12 million [dollars]." *Id.*

CNX offered the testimony of Ross H. Pifer, J.D., LL.M. a professor at Penn State Law School who teaches agricultural law and oil and gas law.  He also supervises a law school clinic focused on rural communities.  He has written

---

[9] A conventional gas well is drilled vertically; unconventional gas well drilling begins in a vertical direction, but then deviates to a horizontal direction, followed by multistage hydraulic fracturing. *Kiskadden v. Department of Environmental Protection*, 149 A.3d 380, 382 n.2 (Pa. Cmwlth. 2016), *petition for allowance of appeal denied*, 168 A.3d 1281 (Pa. 2017).

extensively on the impact of gas extraction on agricultural development. The Zoning Board qualified Professor Pifer as an expert "regarding [the] interplay between the oil and gas industry and agricultural and rural communities in the Commonwealth of Pennsylvania." N.T., 1/28/2015, at 148-49, 152; R.R. 610a-11a, 614a.

Professor Pifer testified that shale gas extraction is taking place in 39 of Pennsylvania's 67 counties. There are approximately 250 shallow gas wells located in the Township, and 102 are active. Professor Pifer testified that there is a long history of safe coexistence between the oil and gas industry and Pennsylvania's rural communities.

Professor Pifer further testified that as of September 30, 2014, there were 261 unconventional shale gas wells in Westmoreland County that used hydraulic fracturing and horizontal drilling. He explained that this type of unconventional drilling has allowed a single multi-well pad to extract the gas reserves from a 20 to 40-acre tract of land. In the past, extracting the same amount of gas would have required 30 to 60 conventional well pads. Thus, unconventional drilling leaves more land for farming while providing economic stability for the farmers leasing their land.

Daniel Bitz, the General Manager of Gas Permitting for Consol Energy, also testified for CNX. He testified that CNX was required to obtain permits from several state agencies in connection with the Porter Pad project. These include a well permit from DEP, which required, *inter alia*, a water management plan and an excavation permit. PennDOT required a driveway connection permit as well as a road maintenance agreement, a road bond, and a posted highway permit.

Bitz explained that after CNX identifies a well site, it must complete a geotechnical sub-surface and hydrologic investigation, along with a wetland stream review. CNX must prepare both an erosion and sediment control plan and a stormwater

7

management plan for DEP. DEP also requires that CNX prepare and maintain a construction "Preparedness, Prevention and Contingency Plan."[10] It must do a mineral study of the well layout and the mineral tract boundaries and complete pre-drill and post-drill water surveys on all water sources within 2,500 feet of the well bores. CNX must send notices to all water purveyors within 3,000 feet of the well.

John H. Slike testified. He is a member of Northmoreland Farms, LP, which owns the 330-acre farm where the Porter Pad project is located. Slike testified that there were active conventional gas wells on the farm when he purchased it in 1976. Since then, four additional conventional gas wells have been drilled. The wells do not affect his ability to farm. To the contrary, Slike testified that the income he receives from the CNX lease has enabled his family to continue farming the land, as opposed to developing a 235-unit residential subdivision on it, a purpose for which the farm has been found suitable.

The Zoning Board allowed the Township residents present at the hearing to testify about the Porter Pad project. Some residents expressed concerns that the drilling will pollute the land or spoil their scenic views. Others echoed Slike's testimony that the mineral lease payments will allow farmers to continue farming. Keith Alter, a local farmer, explained that his family loves their farm but struggles financially. He confirmed that gas development has allowed him and others to keep their land in farming rather than sell it to residential developers. Alter observed that if land is sold to real estate developers, then the pristine areas in the Township will, over time, disappear.

---

[10] The purpose of the preparedness, prevention and contingency plan is "to minimize the occurrence of accidents and releases and to reduce risks to human health and the environment …." R.R. 1312a. *See* R.R. 1309a-55a (CNX's "Preparedness, Prevention & Contingency Plan[;] Control and Disposal Plan & Containment Plan").

8

## Zoning Board Decision

The Zoning Board rejected as not credible the testimony of Objectors' primary witnesses, Dr. John Stoltz and Steven Victor, citing their lack of relevant training. It also cited their lack of knowledge about the oil and gas permitting process, the Township's geography, and the specifications of CNX's Porter Pad project. The Zoning Board rejected Objectors' testimony about decreasing property values because it was speculative and unsupported by probative evidence.

The Zoning Board credited Professor Pifer's testimony, including his expert opinion that Zoning Ordinance 01-2010's authorization for "oil and gas operations within the Township's agricultural zoned areas, is proper and compatible within a rural agricultural zone and can safely coexist therein." Zoning Board Decision, 3/5/2015, at 30 (Board Decision at ___); Finding of Fact No. 47. The Zoning Board also credited Daniel Bitz's testimony about the thorough and extensive environmental protection reviews CNX must undergo to obtain permits from the Commonwealth. Finally, the Zoning Board credited Kyle Stefanick's testimony about the prevalence of drilling activity in the Township.

Based upon the evidence of record, including the above testimony, the Zoning Board made the following pertinent findings of fact:

> 59. Approximately 12,000 of the 20,000 total acres in the Township are leased to oil and gas operators. This represents more than 60 [percent] of the land mass of the Township.
>
> 60. In the R-2 District, approximately 75 [percent] of the land mass is leased to oil and gas operators.
>
> * * *
>
> 64. In addition to considering where an operator holds leases, factors such as topography, adjacent land uses, and required buffers around existing buildings and water wells limit the

9

placement of oil and gas operations in the Township. [ ] [T]he 500 foot buffer from wellbore to existing building mandated by Section 3215(a) of the Oil and Gas Act, 58 [Pa. C.S.] §3215, alone eliminates more than 50% of the Township's land mass from possible unconventional gas well development, without taking into account the other factors noted above.

* * *

69.  The only temporary feature of the Porter Pad that will be visible to [Objectors] from their homes is the drilling rig.  No permanent feature of the Porter Pad will be visible to [Objectors] from their homes.

* * *

74.  The traffic for the Porter Pad will not go past the homes of [Objectors].

* * *

84.  [Slike] testified that existing gas wells have not affected his ability to actively farm his property.

85.  [Slike] testified that in the event he was unable to receive royalties from the gas well sites and the proposed Porter Pad, he would suffer financial hardship and substantial financial loss.  He further testified that in the event he is not able to receive royalties from the proposed Porter Pad, he would not have enough money to actively farm the property . . . .

* * *

95.  Leasing already has brought in excess of $12,000,000 in lease rentals to landowners of the Township in 2014.

96.  Drilling and production of the newly leased properties alone will add an estimated additional $60 – 90 million in income.

97.  Once drilling operations cease, the affected land can be returned to its existing use.[]

10

Board Decision at 36-40; Findings of Fact Nos. 59-60, 64, 69, 74, 84-85, 95-97 (internal citations to the record omitted).

The Zoning Board rejected Objectors' challenge to the substantive validity of Zoning Ordinance 01-2010. It rejected Objectors' challenge to the permit issued to CNX for the Porter Pad project because their appeal was based solely on the rejected premise that Zoning Ordinance 01-2010 was invalid.

The Zoning Board concluded that Zoning Ordinance 01-2010 was neither arbitrary nor unreasonable in violation of substantive due process but, rather, promoted the public health, safety, and welfare of the Township. Further, the Township "acted within its constitutional police power in enacting [Zoning Ordinance 01-2010] to further the general welfare of its citizens by permitting them to benefit economically from oil and gas resources and royalties, in order to help their livelihood and way of life." Board Decision at 46; Conclusion of Law No. 21. The Zoning Board emphasized that Zoning Ordinance 01-2010 requires gas drilling to comply "with rigorous state and federal permitting requirements[]," which includes substantial buffers or setbacks, and supplements "those requirements with additional standards and criteria aimed at mitigating local impact." Board Decision at 47; Conclusion of Law No. 25. The Zoning Board further observed that Pennsylvania law has never provided that land zoned for agriculture must be used exclusively for agricultural purposes. To invalidate Zoning Ordinance 01-2010 could result in an "unconstitutional taking and [a] violation of the prohibition against ex post facto laws." Board Decision at 54; Conclusion of Law No. 43.

The Zoning Board found that Objectors did not present credible, substantial evidence that the Porter Pad would have an adverse effect on public health, safety, welfare or the environment. The Board explained that "Pennsylvania appellate

11

courts have long held that generalized, speculative complaints about traffic, environmental impacts and devaluation of property fail to demonstrate an 'adverse' effect or 'an interest beyond the common interest of all citizens that the law be obeyed,' and are insufficient to sustain a zoning appeal." Board Decision at 49-50; Conclusion of Law No. 32 (quoting *Nernberg v. City of Pittsburgh*, 620 A.2d 692, 695 (Pa. Cmwlth. 1993); *Masside Associates, Ltd. v. Zoning Hearing Board of Municipality of Monroeville*, 454 A.2d 199, 203 (Pa. Cmwlth. 1982)).

The Zoning Board rejected Objectors' claim under the Environmental Rights Amendment, explaining that Objectors' reliance on *Robinson Township v. Commonwealth*, 83 A.3d 901 (Pa. 2013) (plurality) (*Robinson Township II*),[11] was misplaced. In *Robinson Township II*, the Supreme Court addressed an amendment to the Pennsylvania Oil and Gas Act,[12] known as Act 13, and held that it unconstitutionally deprived municipalities of the ability to make zoning decisions about oil and gas extraction. The Supreme Court did not address the case at hand, *i.e.,* where the municipality has exercised its power to decide where oil and gas extraction can take place. Indeed, the Zoning Board noted that the *Robinson Township II* plurality stated that protection of the environment is a "quintessential[ly] local issue that must be tailored to local conditions." Board Decision at 51; Conclusion of Law No. 37 (quoting *Robinson II*, 83 A.3d at 979).

The Zoning Board rejected Objectors' claim that Zoning Ordinance 01-2010 instituted a scheme of impermissible "spot zoning." Because the ordinance

---

[11] In *Robinson Township II*, the Pennsylvania Supreme Court affirmed in part, reversed in part and remanded this Court's decision in *Robinson Township v. Commonwealth*, 52 A.3d 463 (Pa. Cmwlth. 2012) (*Robinson Township I*). In its mandate, the Supreme Court stated that "enforcement of Section 3215(b)(4), 3215(d) and 3304 is hereby enjoined." *Robinson Township II*, 83 A.3d at 1000. As explained, *infra*, other provisions in Section 3200 of Act 13 were left intact and enforceable.

[12] Act of February 14, 2012, P.L. 87, *as amended*, 58 Pa. C.S. §§2301-3504.

allows oil and gas development by right in all districts, there is no "spot" being singled out for special treatment. Board Decision at 45-46; Conclusion of Law No. 20.

For all the above-stated reasons, the Zoning Board rejected Objectors' substantive validity challenge and their appeal of the permit issued to CNX. Objectors appealed to the trial court.

## Trial Court Opinion

The trial court affirmed the Zoning Board's decision without receiving additional evidence. In relevant part, the trial court concluded:

> Here, the legislative body sought to further the general welfare of its citizens by permitting them to benefit economically from oil and gas resources and royalties, and enabling them to retain the agricultural use and rural setting of their land. Absent a finding that this ordinance was unreasonable, arbitrary, or not substantially related to the police power or interests that the ordinance purports to serve, *the presumption of constitutionality cannot be overcome. [Objectors] have not met their burden in this case*.

> With respect to the illegal "spot" zoning allegation, this argument fails because there is no "spot" being zoned in this case. The ordinance permits oil and gas development by right in all districts; therefore, there is no specific area or "spot" that is being treated any differently from the surrounding land with regard to oil and gas development.

> * * *

> [T]he Board correctly found that [Objectors] failed to prove that they would suffer a concrete injury or deprivation sufficient to bring a due process claim. As noted by the [Zoning Board], even if [Objectors'] rights were affected, [Zoning Ordinance 01-2010] "promote[s] public health, safety, and welfare of the community by requiring that any such activity complies with rigorous state and federal permitting requirements, and by supplementing those

13

requirements with additional standards and criteria aimed at mitigating local impact."

Trial Court Op., 10/21/2015, at 5-6 (emphasis added).

Accordingly, the trial court denied Objectors' appeal, and they have appealed to this Court.

## Issues

On appeal,[13] Objectors raise the following issues: (1) whether the Township's zoning ordinance violates substantive due process by instituting illegal spot zoning; (2) whether CNX's permit to develop an unconventional gas well in the R-2 Zoning District violates the Environmental Rights Amendment; and (3) whether permitting oil and gas development in every zoning district violates the MPC.[14] We address these issues *seriatim.*

## Substantive Due Process

Objectors contend that Zoning Ordinance 01-2010 contravenes substantive due process because the Township failed to (1) consider the public interest of the the community as a whole; (2) protect the lives, morals, health, comfort and general welfare; and (3) insure that an individual's use of his property will not infringe upon the property rights of neighboring property owners. Objectors contend that the

---

[13] Where, as here, the trial court does not take additional evidence, this Court's review determines whether the Zoning Board committed an abuse of discretion or an error of law. *JoJo Oil Company, Inc. v. Dingman Township Zoning Hearing Board*, 77 A.3d 679, 685 n.6 (Pa. Cmwlth. 2013). An abuse of discretion will be found where the Zoning Board's findings of fact are not supported by substantial evidence. *Id.*

[14] Appellees (collectively, CNX) have filed a joint brief to this Court. The Clean Air Council and Citizens for Pennsylvania's Future filed an *amicus curiae* brief in support of Objectors. Brian Coppola and David Ball filed an *amicus curiae* brief in support of Objectors. The Delaware Riverkeeper Network filed an *amicus curiae* brief in support of Objectors. The Pennsylvania State Association of Township Supervisors and the Pennsylvania Chamber of Business and Industry filed *amicus curiae* briefs in support of the Township.

14

Township has failed to designate uses within the same district that are compatible and, thus, has engaged in impermissible "spot zoning."

CNX counters that spot zoning occurs when an ordinance treats one "spot" of land in a different manner than similar surrounding land.[15] Here, no land in the Township is being treated differently because oil and gas development is permitted by right in every zoning district. CNX challenges Objectors' premise that oil and gas development is incompatible with the uses allowed in the R-2 District. In support, CNX points to the Zoning Board's finding that oil and gas development has long existed in agricultural and rural zoning districts, both in the Township and in Westmoreland County. Further, numerous gas wells already exist in the Township's agricultural and rural areas.

We begin with the Pennsylvania Supreme Court's explication of how to analyze a substantive due process challenge to a zoning ordinance:

> A zoning ordinance is a valid exercise of the police power when it promotes public health, safety or welfare and its regulations are substantially related to the purpose the ordinance purports to serve…. In applying that formulation, Pennsylvania courts use a substantive due process analysis which requires a reviewing court to balance the public interest served by the zoning ordinance against the confiscatory or exclusionary impact of regulation on individual rights…. The party challenging the constitutionality of certain zoning provisions must establish that they are arbitrary, unreasonable and unrelated to the public health, safety, morals and general welfare…. *Where their validity is debatable, the legislature's judgment must control….*

---

[15] In *DiMattio v. Millcreek Township Zoning Hearing Board*, 147 A.3d 969, 974 (Pa. Cmwlth. 2016), we explained:

> Spot zoning is a singling out of one lot or a small area for different treatment from that accorded to similar surrounding land indistinguishable from it in character, for the economic benefit or detriment of the owner of that lot.

15

*Boundary Drive Associates v. Shrewsbury Township Board of Supervisors*, 491 A.2d 86, 90 (Pa. 1985) (internal citations omitted) (emphasis added). Our Supreme Court has further explained:

> [t]he substantive due process inquiry, involving a balancing of landowners' rights against the public interest sought to be protected by an exercise of the police power, must accord substantial deference to the preservation of rights of property owners, within constraints of the ancient maxim of our common law, *sic utere tuo ut alienum non laedas* … [advising to] use your own property as not to injure your neighbors. A property owner is obliged to utilize his property in a manner that will not harm others in the use of their property, and zoning ordinances may validly protect the interests of neighboring property owners from harm.

*In re Realen Valley Forge Greenes Associates*, 838 A.2d 718, 728 (Pa. 2003) (quoting *Hopewell Township Board of Supervisors v. Golla*, 452 A.2d 1337, 1341-42 (Pa. 1982) (internal citation omitted)). Where a zoning hearing board's findings of fact are supported by substantial evidence, "those findings of fact are binding upon this Court for purposes of appellate review." *DiMattio v. Millcreek Township Zoning Hearing Board*, 147 A.3d 969, 374 (Pa. Cmwlth. 2016). Objectors do not assert that the Zoning Board's findings of fact are not supported by substantial evidence; they do not challenge its factual findings on any ground. They are binding on this Court.

Here, the Zoning Board found that oil and gas operations have long existed in the R-2 Zoning District and provide needed income to Township residents, particularly farmers, so that they can maintain "their livelihood and way of life." Board Decision at 39-40, 46; Findings of Fact Nos. 85, 96-97; Conclusion of Law No. 21. Notably, in *Robinson Township II*, 83 A.3d at 954, the plurality recognized "that development promoting the economic well-being of the citizenry obviously is a

legitimate state interest." The Zoning Board found, as fact, that oil and gas operations, including shale gas development, have compatibly coexisted with other uses in the Township's rural areas for many years. To issue a permit, DEP, *inter alia*, specifically considers the impact of oil and gas drilling upon the community and environment and requires compliance with the setback requirements in 58 Pa. C.S. §3215. *See, e.g., Pennsylvania Independent Oil and Gas Association v. Department of Environmental Protection*, 146 A.3d 820 (Pa. Cmwlth. 2016), *affirmed*, 161 A.3d 949 (Pa. 2017) (discussing DEP's permitting process for unconventional gas wells). In accordance with these findings, the Zoning Board concluded that Zoning Ordinance 01-2010 represented an appropriate exercise of the police power.

Relying on the testimony of Dr. Stoltz and Steven Victor, Objectors contend that unconventional gas wells will have a negative impact on the surrounding community. However, the Zoning Board rejected the testimony of these witnesses as not credible because of their lack of knowledge about the Township's geography, its water resources or CNX's operations. A zoning hearing board, "as fact finder, is the ultimate judge of credibility and resolves all conflicts of evidence." *In re Appeal of Brickstone Realty Corporation*, 789 A.2d 333, 339 (Pa. Cmwlth. 2001). Indeed, a zoning hearing board "has the power to reject even uncontradicted testimony if [it] finds the testimony lacking in credibility." *Constantino v. Zoning Hearing Board of Borough of Forest Hills*, 618 A.2d 1193, 1196 (Pa. Cmwlth. 1992). Here, the Zoning Board determined that Objectors "did not present credible, substantial evidence" that the Porter Pad "will, in fact, have any adverse effect on public health, safety, welfare or the environment." Board Decision at 49; Conclusion of Law No. 32. The Zoning Board's reasons for this determination are fully explained and supported by the record.

17

Objectors presume, without any supporting evidence, that oil and gas operations, by their very nature, adversely affect property rights.[16] Mere speculation is insufficient to establish a real possibility of concrete harm to their property rights. *See Rural Area Concerned Citizens, Inc. v. Fayette County Zoning Hearing Board*, 646 A.2d 717, 722 (Pa. Cmwlth. 1994) (objectors' evidence of harm must meet a high degree of probability standard).[17]

The Zoning Board found, as fact, that no permanent feature of the Porter Pad will be visible to Objectors from their homes; that vehicular traffic to and from the Porter Pad will not go past Objectors' homes; and that no credible evidence of harm to Objectors or the community was presented. To the contrary, the credited evidence established that existing gas wells have not impeded, but advanced, the ability of farmers in the Township to continue to use their land for farming. Board Decision at 37, 39; Findings of Fact Nos. 69, 85. The Zoning Board's findings of fact are binding because they have not been challenged. *DiMattio*, 147 A.3d at 374.

---

[16] For example, Objectors state in their brief:

> An industrial unconventional gas well site, such as the Porter [P]ad, next door to [Objectors'] homes upsets their investment backed expectations of buying a home in a quiet, residential-agricultural area by causing industrial operations for years to come; diminishing the value of their properties; injecting a source of industrial air pollution; subjecting [Objectors] and their children to periods of round-the-clock lighting, flaring, truck traffic, dust, and noise; and raising a risk of industrial accidents that may force them to evacuate.

Objectors' Brief at 38. However, Objectors did not present credible evidence to substantiate these allegations.

[17] Notably, a gas well operator engaged in hydraulic fracturing and drilling operations is not subject to strict liability in tort. *See, e.g., Ely v. Cabot Oil & Gas Corp.*, 38 F. Supp. 3d 518, 520, 531 (M.D. Pa. 2014) (holding that natural gas drilling does not constitute an abnormally dangerous activity because the "risks may be substantially reduced through the exercise of due care in this field").

Objectors stated that the construction at the Porter Pad site was "noisy" and "inconvenient[;]" voiced concern that their property may become "polluted[;]" and opined that their property values would decrease. This Court has rejected this type of evidence as insufficient to establish the requisite harm.

In *Gorsline v. Board of Supervisors of Fairfield Township,* 123 A.3d 1142 (Pa. Cmwlth. 2015), *reversed on other grounds,* 186 A.3d 375 (Pa. 2018), a gas company sought a conditional use permit to operate an oil and gas well.[18] Neighboring landowners objected, expressing concerns about their well water, the increase in truck traffic, noise and light pollution. This Court found the objectors' evidence lacked probative value because it focused upon the truck deliveries during the construction phase of the project. However, zoning "regulates the *use* of land and not the particulars of development and construction." *Id.* at 1153 (quoting *In re Thompson*, 896 A.2d 659, 671 (Pa. Cmwlth. 2006) (emphasis in original)). We further explained that the objectors' "expressed concerns" consisted of no more than "speculation of possible harms[,]" which was "insufficient to show that the proposed natural gas well will be detrimental to the health, safety and welfare of the neighborhood." *Gorsline*, 123 A.3d at 1153.

This Court reached the same conclusion in *EQT Production Company v. Borough of Jefferson Hills,* 162 A.3d 554 (Pa. Cmwlth. 2017), *petition for allowance of appeal granted in part,* 179 A.3d 454 (Pa. 2018).[19] In that case, the objectors

---

[18] *Gorsline* involved a zoning ordinance that did not expressly address oil and gas wells. Using the savings clause in the ordinance, the applicant gas company sought a conditional use permit on the theory that a shale gas well was similar to other uses permitted in the residential agricultural zoning district. On appeal from this Court's decision, the Supreme Court held, in a split decision, that the applicant did not meet its burden on similarity.

[19] The Supreme Court limited its allowance of appeal in *EQT Production Company* to the following issue:

presented evidence about the negative impacts oil and gas operations have caused in other communities. This Court held that this evidence was insufficient to satisfy the objectors' burden of proof because their evidence was not specific to the well site at issue. Nor did the objectors relate the experience of other communities to the well site they challenged. *Id.* at 563.

The Zoning Board's rejection of Objectors' evidence as lacking probative value is consistent with this Court's precedent. Testimony that merely speculates on possible harm lacks probative value.

Objectors next argue that an "industrial" use such as a natural gas well is incompatible with and must be segregated from the other uses in the R-2 Zoning District.[20] They argue that this Court's holding in *Robinson Township I*, 52 A.3d 463, supports this argument. We disagree.

---

Whether the Commonwealth Court erred as a matter of law by imposing a standard upon the admissibility of objectors' evidence that effectively eliminates the ability to raise any objection to a land use application based on firsthand experience with a similar use when the proposed use does not already appear within municipal borders?

*EQT Production Company*, 179 A.3d at 454.

[20] Objectors call oil and gas drilling "industrial" throughout their briefs. Objectors presented no evidence to the Zoning Board on what they meant by "industrial" or the significance of that term. By contrast, in *Delaware Riverkeeper Network v. Middlesex Township Zoning Hearing Board* (Pa. Cmwlth., Nos. 1229,1323 & 2609 C.D. 2015, filed June 7, 2017), *vacated and remanded*, 190 A.3d 1126 (Pa. 2018) (*per curiam*), the parties addressed the meaning of "industrial." Relying on expert testimony from R.E. Gas Development, LLC, the zoning hearing board found that oil and gas drilling is not a heavy industrial use but "a use traditionally exercised in agricultural areas, containing [temporary] components of an 'industrial use.'" *Id.*, slip op. at 14. Farming uses heavy machinery; in this respect it also contains components of an "industrial use."

Objectors may have adopted the term "industrial" from *Robinson Township I*, 52 A.3d at 484-85, which stated that Act 13 used "industrial criteria" for regulating drilling operations and referred to such operations as "industrial uses." *Robinson Township I* arose from a facial challenge to Act 13 decided on an expedited basis on a motion for summary relief filed by the petitioners, cross-motions for summary relief filed by the respondents and preliminary objections filed by the Commonwealth

In *Robinson Township I*, this Court held that Act 13 violated substantive due process because it deprived municipalities of the ability to evaluate their own territorial features and to decide, as a local matter, where oil and gas operations should take place. We described Act 13's encroachment on a municipality's ability to determine what uses to allow in a zoning district to constitute a type of illegal "spot use." *See Robinson Township I*, 52 A.3d at 485 n.23.

By contrast, here, the municipality has evaluated its landscape and has chosen to allow oil and gas operations to take place in every zoning district, so long as certain exacting standards are satisfied.[21] This Court's *Robinson Township I* substantive due process analysis is not applicable here because it addressed Act 13's deprivation of a municipality's ability to determine the placement of oil and gas operations. By contrast, Zoning Ordinance 01-2010 expressed the will of the Township's residents by their elected Board of Supervisors.[22]

The Zoning Board held that Objectors failed to prove that Zoning Ordinance 01-2010 violated substantive due process. It held, to the contrary, that Zoning Ordinance 01-2010 preserves the protected "rights of property owners" to

and the Public Utility Commission. *Robinson Township I*, 52 A.3d at 468. There was no evidentiary record in *Robinson Township I*, let alone findings of fact.

[21] Objectors' witness, Steven Victor, observed that the standards and conditions in Zoning Ordinance 01-2010 made the permitted use of oil and gas development more akin to a use permitted by special exception. N.T. 9, 3/5/2015; R.R. 996a. "A special exception is not an exception to the zoning ordinance, but rather a use to which the applicant is entitled provided the specific standards enumerated in the ordinance for the special exception are met by the applicant." *In re Thompson*, 896 A.2d 659, 670 (Pa. Cmwlth. 2006).

[22] The dissent of Judge McCullough asserts that Zoning Ordinance 01-2010 "duplicates" the "flaw" in Act 13 by permitting oil and gas operations in all zoning districts. The plurality in *Robinson Township II,* 83 A.3d 901, did not conclude that oil and gas drilling must be excluded from some zoning districts in order for the zoning ordinance to comply with the Environmental Rights Amendment. The real flaw in Act 13 was that it deprived municipalities of the ability to legislate on the location of oil and gas drilling in violation of substantive due process.

21

realize the value of their mineral deposits but without causing cognizable injury to their neighbors. *In re Realen Valley Forge*, 838 A.2d at 728. Discerning no error in the Zoning Board's conclusion, we hold that Zoning Ordinance 01-2010 does not violate substantive due process.

## Environmental Rights Amendment

Objectors next argue that Zoning Ordinance 01-2010 violates the Environmental Rights Amendment, which provides as follows:

> The people have a right to clean air, pure water, and to the preservation of the natural, scenic, historic and esthetic values of the environment. Pennsylvania's public natural resources are the common property of all the people, including generations yet to come. As trustee of these resources, the Commonwealth shall preserve and maintain them for the benefit of all the people.

PA. CONST. art. I, §27. Objectors contend that placing a so-called "industrial" use, such as an unconventional gas well, in agricultural areas "degrades the local environment in which people live, work, and recreate, including the public natural resources on which people rely." Objectors' Brief at 49.

Before the Zoning Board, Objectors relied upon the plurality decision in *Robinson Township II*, 83 A.3d 901, to support their Article I, Section 27 claim. The Zoning Board rejected Objectors' claim that *Robinson Township II* required the Township to undertake "an undefined pre-action environmental impact analysis" before enacting Zoning Ordinance 01-2010. Board Decision at 44. Further, because the Township had long allowed the development of oil and gas wells, the community's "settled expectations" included gas development as a "valid part of life in the Township." *Id.* at 52.

In *Robinson Township II*, a plurality of our Supreme Court held that the Environmental Rights Amendment made the natural resources of the Commonwealth

22

the corpus of a public trust. The plurality explained that as a "trustee, the Commonwealth is a fiduciary obligated to comply with the terms of the trust and with standards governing a fiduciary's conduct." *Id*. at 957. The Commonwealth must, first, refrain from allowing the degradation of environmental resources and, second, act affirmatively to protect the environment. Nevertheless, these duties "do not require a freeze of the existing public natural resource stock … [and] are tempered by legitimate development tending to improve upon the lot of Pennsylvania's citizenry, with the evident goal of promoting sustainable development." *Id*. at 958.

The plurality in *Robinson Township II* criticized *Payne v. Kassab*, 312 A.2d 86 (Pa. Cmwlth. 1973), *affirmed*, 361 A.2d 263 (Pa. 1976), which established a three-part test to determine whether government action complied with the Environmental Rights Amendment.[23] *Robinson Township II* did not reverse *Payne v. Kassab*, and this Court continued to apply the *Payne* test to analyze alleged violations of the Environmental Rights Amendment. *See, e.g., Funk v. Wolf*, 144 A.3d 228, 234 (Pa. Cmwlth. 2016) ("The *Payne* test is particularly applicable in situations where a person challenges a government decision or action.").

However, in 2017, the Supreme Court overruled the *Payne* test in *Pennsylvania Environmental Defense Foundation v. Commonwealth*, 161 A.3d 911,

---

[23] Under the so-called *Payne* test, a court reviewing governmental action considers:

> (1) Was there compliance with all applicable statutes and regulations relevant to the protection of the Commonwealth's public natural resources? (2) Does the record demonstrate a reasonable effort to reduce the environmental incursion to a minimum? (3) Does the environmental harm which will result from the challenged decision or action so clearly outweigh the benefits to be derived therefrom that to proceed further would be an abuse of discretion?

*Payne*, 312 A.2d at 94. At issue in *Payne* was a decision of the Pennsylvania Department of Transportation to encroach upon a park in the City of Wilkes-Barre to widen a state road. PennDOT's action was held not to offend the Environmental Rights Amendment.

930 (Pa. 2017) (*Environmental Defense Foundation II*).  The ruling in *Environmental Defense Foundation II*, as did the ruling in *Payne*, concerned publicly owned land, to wit, the constitutionality of budget-related decisions that resulted in additional oil-and-gas lease sales.  As the Supreme Court observed, the former law on the subject provided that all royalties from the leasing of public lands were deposited into an "Oil and Gas Lease Fund" to be "'exclusively used for conservation, recreation, dams, or flood control or to match [related] Federal grants,' 71 P.S. §1331…." *Id.* at 922.  In 2009, the General Assembly amended the Fiscal Code to permit the deposit of these royalties into the General Fund, 72 P.S. §1602-E, and to limit the amount allocated to the Department of Conservation and Natural Resources to $50,000,000.  72 P.S. §1603-E.[24]  The Environmental Defense Foundation argued, *inter alia*, that these amendments to the Fiscal Code violated the Environmental Rights Amendment.

Our Supreme Court rejected the *Payne* test as the "appropriate standard for deciding Article I, Section 27 challenges."  *Environmental Defense Foundation II*, 161 A.3d at 930.  It held that the Commonwealth acts as a "trustee of the environmental trust created by the people of Pennsylvania." *Id.* at 932.[25]  It held Sections 1602-E and

---

[24] Sections 1602-E and 1603-E of the Fiscal Code were added by the Act of October 9, 2009, P.L. 537.

[25] The Supreme Court explained the Commonwealth's duty as a trustee of public natural resources as follows:

> Under Pennsylvania trust law, the duty of prudence requires a trustee to exercise such care and skill as a man of ordinary prudence would exercise in dealing with his own property….  The duty of loyalty imposes an obligation to manage the corpus of the trust so as to accomplish the trust's purposes for the benefit of the trust's beneficiaries….  The duty of impartiality requires the trustee to manage the trust so as to give all of the beneficiaries due regard for their respective interests in light of the purposes of the trust….

*Environmental Defense Foundation II*, 161 A.3d at 932-33 (internal quotations and citations omitted).

24

1603-E of the Fiscal Code to be unconstitutional because they did not allocate "the royalties in a manner consistent with [the Commonwealth's] Section 27 trustee duties." *Environmental Defense Foundation II*, 161 A.3d at 938. The Supreme Court explained that the Commonwealth does not manage our public natural resources as a proprietor but must "fulfill its role as a trustee." *Id.* at 939.[26]

In their supplemental brief,[27] Objectors contend that under *Environmental Defense Foundation II*, the Township, as a trustee, has a duty to prevent environmental degradation in the community and breached this duty in the enactment of Zoning Ordinance 01-2010.[28] The *Payne* test, *inter alia*, directed that where the environmental harm "so clearly outweighs the benefits," the governmental action violates the Environmental Rights Amendment. *Payne*, 312 A.2d at 94. Objectors suggest that the Zoning Board erred by applying this balancing test in rejecting Objectors' challenge to Zoning Ordinance 01-2010.[29] They maintain that oil and gas development is not compatible with rural and agricultural uses.

---

[26] Additionally, the Supreme Court remanded the case to this Court because it was unclear from the record whether payments made for rental of public land were part of the trust. The Court directed the parties to "develop arguments" concerning the proper classification of such rental payments. *Id.* at 936.

[27] On January 3, 2018, this Court ordered the parties to file supplemental briefs on whether *Environmental Defense Foundation II* impacts the present case.

[28] Specifically, Objectors contend that "[the] Township, through [its] irrational zoning scheme, has intentionally acted as a proprietor, selling [its] incredible natural resources to the oil and gas industry rather than conservatively preserving the integrity of the community for future generations." Objectors' Supplemental Brief at 11.

[29] In actuality, the Zoning Board did not apply the *Payne* test. In evaluating Objectors' substantive validity challenge, the Zoning Board noted that Zoning Ordinance 01-2010 balanced the interest of private property owners with the public health, safety and welfare of the community. This balancing of interests goes into the enactment of any land use regulation. The Zoning Board referred to the *Payne* test but it did not employ it in its analysis of Objectors' claim under the Environmental Rights Amendment. Board Decision at 44, Conclusion of Law 13.

25

CNX argues that *Environmental Defense Foundation II* has no impact on this case because its holding concerned the Commonwealth's use of revenues generated by natural gas drilling on public land held in trust for Pennsylvania's citizens. The zoning ordinance at issue here concerns, and restricts, the right of landowners to lease their private land for a private activity. Aside from acknowledging that natural gas development can coexist with the public use of state forests, CNX argues that *Environmental Defense Foundation II* provides little guidance to our review of the Zoning Board's decision.

CNX observes that the focus of *Environmental Defense Foundation II* was the Commonwealth's obligations with respect to state parks and forests. The Supreme Court stated as follows:

> Because *state parks and forests*, including the oil and gas minerals therein, *are part of the corpus of Pennsylvania's environmental public trust*, we hold that the Commonwealth, as trustee, must manage them according to the plain language of Section 27, which imposes fiduciary duties consistent with Pennsylvania trust law.

*Environmental Defense Foundation II*, 161 A.3d at 916 (emphasis added).[30] Local zoning by municipalities was not an issue in the case. CNX further argues that the Slikes' farm is not part of the "corpus of Pennsylvania's environmental trust." *Id.*[31] It is private land.

---

[30] CNX points out that in *William Penn School District v. Department of Education,* 170 A.3d 414, 456 (Pa. 2017), the Supreme Court stated, *inter alia,* that the Environmental Rights Amendment "imposes limitations … upon how the Commonwealth may dispose of the net proceeds of sale of public natural resources."

[31] Notably, the second sentence of the Environmental Rights Amendment was amended to "include the term 'public' to indicate that it did not apply to purely private property rights." *Environmental Defense Foundation II*, 161 A.3d at 931 n.22. "However, Representative Kury opined that the trust

26

In *Environmental Defense Foundation II*, the Supreme Court addressed each of the three sentences in the Environmental Rights Amendment. It observed that "the right of citizens to clean air and pure water, and to the preservation of natural, scenic, historic values of the environment[ ]" set forth in sentence one "places a limitation on the state's power to act contrary to this right, and while the subject of this right may be amenable to regulation, any laws that unreasonably impair the right are unconstitutional." *Id*. at 931 (citing *Robinson Township II*, 83 A.3d at 951). Also in *Robinson Township II*, the plurality stated expressly that "the constitutional obligation binds all government, state or local, concurrently." *Robinson Township II*, 83 A.3d at 952 (citation omitted).

The precise duties imposed upon local governments by the first sentence of the Environmental Rights Amendment are by no means clear. In the first case to address the Environmental Rights Amendment, our Supreme Court observed that the values protected in the first sentence are subject to interpretation:

> "[C[lean air" and "pure water" require technical definitions, since they depend, to some extent, on the technological state of the science of purification. The other values, "the natural, scenic, historic and esthetic values" of the environment are values which have heretofore not been the concern of government.

*Shapp v. National Gettysburg Battlefield Tower, Inc,*. 311 A.2d 588, 593 (Pa. 1973). The uncertainty posed by these values placed a property owner at risk of not knowing to what use he could put his property, a result the Supreme Court described as "unjust."

---

nevertheless applied to 'resources owned by the Commonwealth and also to those resources not owned by the Commonwealth, which involve a public interest.'" *Id*. (quoting Pa. L. Journal, 154th General Assembly, No. 118, Reg. Sess., 2271–72 (1970) (statement by Rep. Kury)). *Environmental Defense Foundation II* also adopted *Robinson Township II's* statement that trustee obligations apply to both state and local entities, which must act with prudence, loyalty and impartiality. *Environmental Defense Foundation II*, 161 A.3d 932 n. 23.

27

*Id.* The Supreme Court cautioned that this lack of certainty raised "serious questions under both the equal protection clause and the due process clause of the United States Constitution." *Id.*

In *Robinson Township II*, the Supreme Court plurality acknowledged these constitutional concerns. The plurality explained that the "Environmental Rights Amendment does not call for a stagnant landscape" or "for the derailment of economic or social development" or "for a sacrifice of other fundamental values." *Robinson Township II*, 83 A.3d at 953. The plurality further explained that

> the first clause of Section 27 *does not impose express duties on the political branches to enact specific affirmative measures* to promote clean air, pure water, and the preservation of the different values of our environment ….

*Id.* at 951 (emphasis added). Nevertheless, when the government acts, "*it must reasonably account for the environmental features* of the affected locale…." *Id.* (emphasis added).[32] Judicial review of the government's action requires an evidentiary hearing to determine, first, whether the values in the first clause of the Environmental Rights Amendment are implicated and, second, whether the governmental action unreasonably impairs those values.

Zoning accounts for the "natural, scenic, historic and esthetic values of the environment." PA. CONST. art. I, §27. It does so by placing compatible uses in the same zoning district; by establishing minimum lot sizes and dimensional requirements;

---

[32] For example, a municipality might be said not "to account reasonably" for environmental features should it exercise its eminent domain power to condemn an 18th century inn where George Washington once slept in order to create a parking lot for a municipal building. In such a case, as in all eminent domain cases, an evidentiary record and factual findings by the court of common pleas would be required to answer the question.

providing parking and signage controls; and requiring landscape and screening controls.[33] This list goes on. It is axiomatic that a zoning ordinance must balance the public interests of the community with the due process rights of private property owners. *Village of Euclid v. Ambler Realty Company*, 272 U.S. 365, 387-88 (1926); *National Gettysburg Battlefield Tower, Inc.*, 311 A.2d at 593-94. Further, as a creature of statute, the Township can exercise only those powers that have been expressly conferred upon it by the General Assembly in the MPC and in the Second Class Township Code,[34] by which the Township was created. When a municipality enacts a zoning ordinance, it is bound by the Environmental Rights Amendment and by all the rights protected in Article I of the Pennsylvania Constitution.[35] All must be considered. *See Cavanaugh v. Davis,* 440 A.2d 1380, 1382 (Pa. 1982) ("[B]ecause the Constitution is an integrated whole, effect must be given to all of its provisions whenever possible.")[36]

---

[33]These and other land use concerns are fully addressed in the Township's zoning ordinance. *See* ALLEGHENY TOWNSHIP ZONING ORDINANCE, §§250-1 to 250-155.

[34] Act of May 1, 1933, P.L. 103, *as amended,* 53 P.S. §§65101-68701.

[35] *See* Article I, Sections 1 to 28 of the Pennsylvania Constitution (listing the essential principles of liberty and free government). Importantly, Article I, Section 1, titled "[i]nherent rights of mankind," establishes a constitutionally protected property right in the enjoyment of private property and "governmental interference with this right is circumscribed by the due process provisions of the Fifth and Fourteenth Amendments to the United States Constitution." *Township of Exeter v. Zoning Hearing Board of Exeter Township*, 962 A.2d 653, 659 (Pa. 2009) (quoting *Hopewell Township Board of Supervisors v. Galla*, 452 A.2d 1337, 1341 (Pa. 1982)).

[36] The dissent of Judge McCullough would require the Township to prove that Zoning Ordinance 01-2010 "is narrowly tailored to effectuate its economic interests and that it reflects the least onerous path that can be taken to achieve the objective without an unreasonable degradation of the environment." Dissenting Opinion at 12. She contends that courts must use strict scrutiny in examining the Township's zoning ordinance "in the same manner courts apply to other fundamental rights." *Id.* at 12.

First, the U.S. Constitution makes the protection of property a fundamental right. U.S. CONST., amend. V ("No person shall … be deprived of life, liberty or property, without due process

Objectors assert the Township did not "genuinely consider" the environment in the enactment of Zoning Ordinance 01-2010 or in the issuance of the permit to CNX.[37]  Objectors' Brief at 47.  They presume, contrary to the plurality's

of law").  The Slikes have a fundamental right to use their property interest in their farm's mineral estate.  The dissent does not, however, suggest that the restrictions imposed upon that property interest by various state regulatory laws and by Zoning Ordinance 01-2010 must be shown by the Commonwealth and by the Township to be "narrowly tailored" to achieve their objectives.

Second, the dissent contends that where an "ordinance 'burdens,' 'infringes,' or 'significantly interferes' with a fundamental constitutional right (in this case, the ERA), strict scrutiny analysis is applicable, and the burden shifts to the government…."  Dissenting Opinion at 13 n.11.  Some constitutional challenges require shifting burdens of persuasion to reach a determination.  For example, in a Second Amendment challenge, the challenger must present facts to show that the presumptively-valid regulation burdens his Second Amendment right.  If the burden is shown, then the government must demonstrate that the burden is appropriate. *Bindercup v. Attorney General,* 836 F.3d 336, 346 (3d Cir. 2016) (en banc).  There is no authority for the two-step review proposed by the dissent for a challenge to a zoning ordinance brought under the Environmental Rights Amendment.  Even so, the Zoning Board found that Objectors' evidence did not demonstrate a burden on their rights under the Environmental Rights Amendment.  The factual findings of the Zoning Board are binding.

[37] Judge McCullough agrees with Objectors' assertion.  She would remand to the Zoning Board to take additional evidence "in order for the Township to establish that the novel and drastic measures" it has taken comport with the Environmental Rights Amendment. Dissenting Opinion at 2.  She would require the Township to show "with competent evidence" that "oil and gas operations are compatible in *all* its zoning districts" and prove "as a matter of scientific fact" that the existing oil and gas operations in the R-2 Zoning District have not negatively affected the environment. *Id.* at 15, 16.  The only controversy in this appeal, however, concerns the single unconventional well that lies in the R-2 Zoning District, which makes up 85% of the Township land.  Whether unconventional wells could even be placed in any of the other zoning districts is not of record.  In any case, none of the Objectors live or own property in those districts.

First, the Township does not have the burden of proof.  Zoning ordinances are presumed to be valid and constitutional. *Plaxton v. Lycoming County Zoning Hearing Board,* 986 A.3d 199 (Pa. Cmwlth. 2009).  "Therefore, one challenging the zoning ordinance has the heavy burden of establishing its invalidity." *McGonigle v. Lower Heidelberg Township Zoning Hearing Board,* 858 A.2d 663, 668 (Pa. Cmwlth. 2004).  Objectors, not the Township, had the burden of proving that oil and gas development was incompatible with other uses in the R-2 Zoning District.  The dissent would shift this burden to the Township.

Second, the dissent would require the Township to prove a negative, *i.e.,* no harm to the environment.  This would violate the "well-recognized principle of evidence" that "[i]t is seldom, if

30

instruction in *Robinson Township II*, 83 A.3d at 952, that local governments must enact "specific affirmative measures" to protect the environment that are duplicative of the many state laws that regulate oil and gas operations in Pennsylvania.

Moreover, *Robinson Township II* did not give municipalities the power to act beyond the bounds of their enabling legislation. Municipalities lack the power to replicate the environmental oversight that the General Assembly has conferred upon DEP and other state agencies.[38] Neither *Environmental Defense Foundation II* nor *Robinson Township II* has altered these fundamental principles of Pennsylvania's system of state and local governance.

---

ever, the duty of a litigant to prove a negative until his opponent has come forward to prove the opposing positive." *Fazio v. Pittsburgh Rys Co.,* 182 A. 696, 698 (Pa. 1936). To require a party to prove a negative is to impose an "impossible burden." *Commonwealth v. Buonopane,* 599 A.2d 681, 683 n.2 (Pa. Super. 1991).

Third, the Zoning Board found, as fact, that oil and gas development has safely coexisted in agricultural districts both in the Township and throughout Westmoreland County and is a compatible use in the R-2 Zoning District. The Zoning Board also found that Objectors did not prove that this kind of land use would harm the local environment. Objectors did not challenge any of the Zoning Board's findings of fact on appeal; they are binding. *DiMattio*, 147 A.3d 969.

The purpose of the dissent's proposed remand for the Township to present evidence is opaque. The dissent concedes that the Township supervisors are not required to explain their deliberations in enacting Zoning Ordinance 01-2010. *See, e.g., Nichols v. City of Corry*, 417 A.2d 836 (Pa. Cmwlth. 1980) (the trial court properly excluded testimony of city council members about their intent in passing an ordinance because "[i]t has long been settled, as a corollary to the rule that legislators are generally immune from suit, that members of a legislative body are not subject to inquiry incident to any challenge of its legislation."). The dissent does not identify what evidence the Township must present on remand.

The dissent assumes that the Township's defense of Zoning Ordinance 01-2100 requires evidence. In *Delaware Riverkeeper Network,* 190 A.3d 1126, the zoning hearing board evaluated the ordinance challenged under the Environmental Rights Amendment on the basis of the language of the ordinance. The Supreme Court's *per curiam* order did not hold the zoning hearing board erred in this respect. Rather, it was this Court that erred in its appellate review by using the *Payne* test.

[38] The Zoning Board noted that Daniel Bitz offered extensive testimony on this oversight. Oil and gas operators must complete a Natural Diversity Inventory for the Pennsylvania Department of Conservation and Natural Resources; the Pennsylvania Game Commission; the Pennsylvania Fish and Boat Commission; and the U.S. Fish and Wildlife Services. Board Decision at 14.

31

Section 3302 of the Oil and Gas Act specifically states that a municipality lacks the power to regulate how gas wells operate. Section 3302 provides that "local ordinances purporting to regulate oil and gas operating regulated by Chapter 32 (relating to development) are hereby superseded. No local ordinance adopted pursuant to the MPC or the Flood Plain Management Act shall contain provisions that impose conditions, requirements or limitations" on oil and gas operations regulated by the Oil and Gas Act. 58 Pa. C.S. §3302. Although the last sentence of Section 3302 has been declared unconstitutional, this preemption language was left intact.

In sum, a municipality may use its zoning powers only to regulate *where* mineral extraction takes place. *Hartley & Hartley v. Borough Council,* 964 A.2d 855 (Pa. 2009). A municipality does not regulate *how* the gas drilling will be done. Objectors' complaints about the purported harm to the environment from the operations of the Porter Pad project should have been addressed to the state agencies that issued CNX its operating permits.

In any case, the Zoning Board found that oil and gas development and agricultural uses "have long safely coexisted within rural communities." Board Decision at 42. The only feature of the Porter Pad that will be visible from any of Objectors' homes is the portion of the drilling rig that rises over the treetops. Board Decision at 37; Finding of Fact No. 69. Once drilling operations cease, the rig will be removed during the pumping phase. When pumping ends, the land can be returned to its original state. *Id.* at 40; Finding of Fact No. 97. In the meantime, oil and gas drilling will support the agricultural use of land in the R-2 Zoning District. Objectors did not challenge any of these factual findings.

Objectors did not prove that Zoning Ordinance 01-2010 is a law that "unreasonably impairs" their rights under the Environmental Rights Amendment.[39] Objectors did not prove that Zoning Ordinance 01-2010 does not reasonably account for the natural, scenic, historic and esthetic values of the Township's environment. Indeed, the Zoning Board reached the contrary conclusion. It credited the testimony of CNX's expert, Professor Pifer, who stated that there is a long history of oil and gas development safely coexisting with agricultural uses in the rural areas of the Township and that unconventional gas development will actually help preserve farming in the R-2 District. We hold that Zoning Ordinance 01-2010 does not violate the Environmental Rights Amendment.[40]

---

[39] The brief of *amicus,* the Pennsylvania Chamber of Business and Industry, argues that the Supreme Court's holding in *Environmental Defense Foundation II* is not germane because it addressed the duties of a trustee with respect to public land. The Chamber notes that *dicta* are not binding. Chamber Brief at 6. For purposes of this appeal, we have adopted the principle that "laws" adopted by local government, may not "unreasonably impair" Article I, Section 27 rights.

[40] In her dissent, Judge Ceisler would hold Zoning Ordinance 01-2010 facially unconstitutional under the Environmental Rights Amendment. She contends that the ordinance's conditions imposed upon oil and gas drilling are insufficient, noting, for example, that the hours of operation should be shorter. She further contends that the majority has not given sufficient weight to the plurality opinion in *Robinson Township II.* She recognizes the weaknesses in Objectors' evidence but considers those weaknesses immaterial because she believes Zoning Ordinance 01-2010, on its face, violates the Environmental Rights Amendment.

The plurality opinion in *Robinson Township II* has not been made binding authority. The Supreme Court has approved "the statement of basic principles, thoughtfully developed" on the contours of the Environment Rights Amendment set forth in *Robinson Township II* by the plurality. *Environmental Defense Foundation II*, 161 A.3d at 930. The Supreme Court has not adopted each and every statement in the scholarly and lengthy opinion of the plurality. The Supreme Court did state that for purposes of the first sentence of the Environmental Rights Amendment, "laws that unreasonably impair the right are unconstitutional." *Id.* at 931 (citing *Robinson Township II*, 83 A.3d at 951). The majority has followed that binding and guiding principle in this appeal.

Whether a zoning ordinance "unreasonably impairs" the rights protected by the first sentence of the Environmental Rights Amendment will almost always require an evidentiary hearing and findings of fact. A facial challenge is theoretically possible. A zoning ordinance might, for example,

33

**Violations of the MPC, the Ordinance, and the Permit to CNX**

require that unconventional gas drilling take place only in districts zoned for hospitals and schools and require operators to burn their refuse on site. In almost every other case, including this one, there will have to be a record made to determine whether the law in question "unreasonably impairs" the people's "right to clean air, pure water, and to the preservation of the natural, scenic, historic and esthetic values of the environment." PA. CONST. art. I, §27. Evidence is needed to establish, first, that these enumerated values are at stake and, second, that they have been unreasonably impaired.

Judge Ceisler's dissent also rejects the conditions imposed on drilling by Zoning Ordinance 01-2010 as inadequate. Objectors tried to establish this point with their witness, Steven Victor, who opined that the ordinance conditions did not protect local water supply or adequately address noise and light pollution. He had little knowledge of the Township's water sources and could not offer alternative standards for regulating noise and light pollution. The Zoning Board found him not credible. Whether a zoning ordinance is wise or uses the best means to reach the desired result are matters best left to the Township supervisors, not the courts. *Khan v. State Board of Auctioneer Examiners,* 842 A.2d 936, 947 (Pa. 2004).

In *Gorsline,* 186 A.3d at 389, our Supreme court noted that its "decision should not be construed as an indication that oil and gas development is never permitted in residential/agricultural districts, or that it is fundamentally incompatible with residential or agricultural uses." Here, the Zoning Board also found, as fact, that Zoning Ordinance 01-2010 protects the environment and that the Porter Pad project was a use compatible with other uses in the R-2 District. These findings are binding in our consideration of whether Zoning Ordinance 01-2010 unreasonably impairs Objectors' rights under the Environmental Rights Amendment.

Objectors next argue that Zoning Ordinance 01-2010 violates Sections 603(a),[41] 604[42] and 605[43] of the MPC. Objectors argue it violates Section 603 of the

---

[41] Section 603(a) of the MPC states:

> Zoning ordinances should reflect the policy goals of the statement of community development objectives required in section 606[, 53 P.S. §10606], and give consideration to the character of the municipality, the needs of the citizens and the suitabilities and special nature of particular parts of the municipality.

53 P.S. §10603(a). The Township's statement of community development objectives provides for "the protection of the public health, safety and welfare of the residents[;]" the prevention of "incompatible development or use of land[;]" and the "promotion of conservation of the environment…." ZONING ORDINANCE §250-4 (A), (G) and (I); R.R. 7a-8a.

[42] Section 604 of the MPC provides, in relevant part:

> The provisions of zoning ordinances shall be designed:
>
> > (1) To promote, protect and facilitate any or all of the following: the public health, safety, morals, and the general welfare; coordinated and practical community development and proper density of population; emergency management preparedness and operations, airports, and national defense facilities, the provisions of adequate light and air, access to incident solar energy, police protection, vehicle parking and loading space, transportation, water, sewerage, schools, recreational facilities, public grounds, the provision of a safe, reliable and adequate water supply for domestic, commercial, agricultural or industrial use, and other public requirements; as well as preservation of the natural, scenic and historic values in the environment and preservation of forests, wetlands, aquifers and floodplains.
> >
> > (2) To prevent one or more of the following: overcrowding of land, blight, danger and congestion in travel and transportation, loss of health, life or property from fire, flood, panic or other dangers.
> >
> > (3) To preserve prime agriculture and farmland considering topography, soil type and classification, and present use.

53 P.S. §10604(1) – (3).

[43] Section 605 of the MPC requires, in relevant part:

> In any municipality, other than a county, which enacts a zoning ordinance, no part of such municipality shall be left unzoned. The provisions of all zoning ordinances may be classified so that different provisions may be applied to different classes of situations, uses and structures and to such various districts of the municipality as shall be described by a map made part of the zoning ordinance. Where zoning

35

MPC because "the ordinance is potentially detrimental to public health, safety, and general welfare, as well as detrimental to a safe, reliable and adequate water supply within [the R-2 Zoning District]" and, as such, is contrary to the statement of community objectives set forth in the Zoning Ordinance. Objectors' Brief at 51-52. Objectors contend that Zoning Ordinance 01-2010 violates Section 604 of the MPC because permitting unconventional gas well development in all zoning districts will, as Dr. Stoltz testified, place "water sources and other environmental assets at risk[.]" Objectors' Brief at 52. Objectors assert that Zoning Ordinance 01-2010 violates Section 605 of the MPC because it allows incompatible uses to take place within the R-2 Zoning District.

CNX responds that Objectors' alleged violations of the MPC reiterate the same arguments they made in their substantive due process claim; their arguments should fail for the same reasons discussed earlier in this opinion. We agree.

First, the Zoning Board held that Objectors' claims that Zoning Ordinance 01-2010 will cause safety or environmental problems were not supported by evidence. Objectors have not challenged any of the Zoning Board's findings of fact or conclusions of law on these points. Thus, they have not shown a violation under Section 603 of the MPC.

---

districts are created, all provisions shall be uniform for each class of uses or structures, within each district, except that additional classifications may be made within any district:

(1) For the purpose of making transitional provisions at and near the boundaries of districts.

(1.1) For the purpose of regulating nonconforming uses and structures.

(2) For the regulation, restriction or prohibition of uses and structures at, along or near [delineated areas].

53 P.S. §10605(1), (1.1) and (2).

Second, the Zoning Board rejected Dr. Stoltz as an expert and did not credit his testimony. Thus, Objectors cannot rely on that evidence to support their concerns under Section 604 of the MPC.

Third, the Zoning Board rejected Objectors' assertion that natural gas development is not a compatible use in the R-2 Zoning District. Again, Objectors have not challenged the Zoning Board's findings and point to no credited evidence that would refute this conclusion. Objectors have presented only conclusory arguments without reference to the enumerated uses allowed in the R-2 Zoning District and how oil and gas drilling is incompatible with those uses. Notably, one use permitted by special exception is mineral removal, which includes, *inter alia*, "removal of the surface of the earth or exposure of the mineral or subsurface of the earth" to remove "coal, lignite, limestone and dolomite, sand, gravel, rock, stone, earth, slag, ore, vermiculate, clay and other mineral resources." ZONING ORDINANCE §250-8 (definition of "mineral removal").

Under Section 607 of the MPC, the Township was required to notify the public of its proposed zoning legislation on oil and gas extraction and invite public participation. 53 P.S. §10607. The proposed zoning ordinance had to be advertised and posted in a public location. Section 610 of the MPC, 53 P.S. §10610. The Township was also required to hold a public hearing, pursuant to public notice, before voting to enact the ordinance. Section 608 of the MPC, 53 P.S. §10608. Objectors do not contend that the Township did not follow all of the procedures required by the MPC to allow Township residents to participate in the enactment of Zoning Ordinance 01-2010.

Nevertheless, Objectors claim that *Robinson Township II*, 83 A.3d 901, required the Township to undertake pre-enactment environmental, health, and safety

37

studies in order to satisfy its duties under the Environmental Rights Amendment. The Zoning Board noted that Objectors "presented no evidence on this issue" and, thus, apparently "abandoned this claim." Zoning Board Decision at 49, Conclusion of Law No. 32. In any case, the Zoning Board reasoned that construing the Environmental Rights Amendment to require some sort of "pre-action environmental impact analysis" "is a novel construction without any foundation in Pennsylvania Law." *Id*. We agree.[44]

**Conclusion**

A municipality balances the interest of landowners in the use and enjoyment of their property with the public health, safety and welfare of the community when it enacts land use regulation. *In re Realen Valley Forge Greenes Associates*, 838 A.2d 718, 727-28 (Pa. 2003). However, there is no obligation upon a municipality to enact land use regulation.

That oil and gas drilling is authorized in every zoning district in the Township does not mean that it will take place anywhere or everywhere. The setback requirements in Act 13 remain in effect, *Robinson Township IV*, 147 A.3d at 542 n.3, and they are significant. Section 3915(a) requires a minimum setback requirement of 500 feet from any building. 58 Pa. C.S. §3915(a). As noted by Chief Justice Saylor, one acre is 208 feet by 208 feet, which limits unconventional wells to undeveloped tracts or lots greater than two acres in size. *Robinson Township II,* 83 A.3d at 1101 (Saylor, C.J., dissenting). The Zoning Board specifically found the 500 foot buffer

---

[44] As observed by the *amicus curiae,* Pennsylvania State Association of Township Supervisors, the cost of an environmental impact analysis "could lead municipalities to decide not to engage in zoning at all in order to save precious taxpayer resources…." Pennsylvania State Association of Township Supervisors Brief at 11. If a requirement for environmental impact study can be read into the Pennsylvania Constitution, then this requirement would apply to all legislation, state or local. It would not be limited to one Article I right. Logically, legislative bodies would have to issue a comparable report on each of the rights protected in Article I of the Pennsylvania Constitution.

38

from an existing building or well, alone, eliminated more than 50% of Township land from unconventional gas well development. Board Decision at 37: Finding of Fact. 64.

Zoning Ordinance 01-2010 limits the constitutionally protected property rights of Township residents, including the Slikes, by imposing conditions on the use of their land for oil and gas development. We must presume that the Township's Board of Supervisors "investigated the question and ascertained what is best for … the good of the people[ ]" when it enacted Zoning Ordinance 01-2010. *Khan v. State Board of Auctioneer Examiners*, 842 A.2d 936, 947 (Pa. 2004). Whether Zoning Ordinance 01-2010 "is wise or whether it is the best means to achieve the desired result are matters left to the legislature, and not the courts." *Id.* The Township did not have to enact zoning regulation; *a fortiori*, it does not have a duty to enact a zoning ordinance that imposes more restrictions upon the property rights of those with mineral estates to develop.

As observed by the Zoning Board, it is the Commonwealth's duty to regulate "how" gas drilling is conducted to protect Pennsylvania's waters and air from degradation. *Huntley & Huntley, Inc. v. Borough Council of Borough of Oakmont*, 964 A.2d 855, 866 (Pa. 2009). By contrast, local governments regulate "where" oil and gas operations will take place with zoning ordinances. In this regard, the choices made by the Township in Zoning Ordinance 01-2010 must be affirmed unless clearly arbitrary and unreasonable. Even where the question of reasonableness is "debatable, the legislature's judgment must control." *Boundary Drive Associates*, 491 A.2d at 90. Objectors' proper recourse is to elect a different board of supervisors to achieve their objective of keeping oil and gas drilling out of the R-2 Zoning District.[45]

---

[45] Of course, zoning restrictions cannot forbid a lawful use entirely. Exclusionary zoning is prohibited. *Hanson Aggregates Pennsylvania, Inc. v. College Township Council*, 911 A.2d 592, 595 (Pa. Cmwlth. 2006).

Objectors' objectives in this litigation are confounding. Were they to succeed in invalidating Zoning Ordinance 01-2010, then they release oil and gas operators from the ordinance conditions that relate to noise, lighting, hours, security and dust. Absent Zoning Ordinance 01-2010, CNX's permit could be invalidated. However, CNX would no longer need a "zoning compliance permit" to operate the Porter Pad.

Objectors have failed to demonstrate that the trial court erred in affirming the Zoning Board. In every respect, the Zoning Board's conclusion that CNX complied with the standards in Zoning Ordinance 01-2010 is fully consonant with the evidence. Likewise, Objectors did not specify how the standards and conditions in Zoning Ordinance 01-2010 violated the Environmental Rights Amendment of the Pennsylvania Constitution or deprived them of substantive due process. Finally, they did not demonstrate that Zoning Ordinance 01-2010 violates the MPC. Accordingly, the order of the trial court affirming the order of the Zoning Board will be affirmed.

_____
MARY HANNAH LEAVITT, President Judge

Judge Fizzano Cannon did not participate in the decision in this case.

40

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Dolores Frederick, Patricia Hagaman, and Beverly Taylor,
Appellants

v.

Allegheny Township Zoning Hearing Board

v.

CNX Gas Company, LLC

v.

Allegheny Township

v.

John H. Slike and Anne E. Slike, Northmoreland Farms LP

v.

Michael Golembeiwski and Lisa Golembeiwski, John P. Brunner, II, Esq., Jeffrey and Sheila Brunner, Miller Niksic, Joanne Resh, Richard and Patricia Trumble, Michael and Jacalyn Schumaker

No. 2295 C.D. 2015

# **O R D E R**

AND NOW, this 26th day of October, 2018, the order of the Court of Common Pleas of Westmoreland County, dated October 21, 2015, in the above-captioned matter is AFFIRMED.

_____
MARY HANNAH LEAVITT, President Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Dolores Frederick, Patricia Hagaman, : and Beverly Taylor, :
                Appellants :
                 :
          v. :
                 :
Allegheny Township Zoning Hearing : Board :
                 : No. 2295 C.D. 2015
          v. :
                 : Argued: February 7, 2018
CNX Gas Company, LLC :
                 :
          v. :
                 :
Allegheny Township :
                 :
          v. :
                 :
John H. Slike and Anne E. Slike, : Northmoreland Farms LP :
                 :
          v. :
                 :
Michael Golembeiwski and Lisa : Golembeiwski, John P. : Brunner, II, Esq., Jeffrey and Sheila : Brunner, Miller Niksic, Joanne Resh, : Richard and Patricia Trumble, : Michael and Jacalyn Schumaker :

BEFORE:   HONORABLE MARY HANNAH LEAVITT, President Judge
             HONORABLE RENÉE COHN JUBELIRER, Judge
             HONORABLE P. KEVIN BROBSON, Judge
             HONORABLE PATRICIA A. McCULLOUGH, Judge
             HONORABLE ANNE E. COVEY, Judge
             HONORABLE MICHAEL H. WOJCIK, Judge
             HONORABLE ELLEN CEISLER, Judge

DISSENTING OPINION
BY JUDGE McCULLOUGH                                    FILED:  October 26, 2018

While the Township of Allegheny (Township) undoubtedly has a legitimate interest in sustainable development, I would vacate the order of the Court of Common Pleas of Westmoreland County (trial court) and direct a remand to the Zoning Hearing Board (Board) to receive additional evidence in order for the Township to establish that the novel and drastic measures that it has taken are compatible with article I, section 27 of the Pennsylvania Constitution, Pa. Const. art. I, §27, known as the Environmental Rights Amendment (ERA).[1]

It is without dispute that landowners are entitled to make use of their property and possess the right to "lease" the subterranean portion to third parties for oil and gas exploration and extraction.[2]  For the farmers in the Township and in the Commonwealth, it is often necessary that they receive income from other sources to maintain a way of life, and this need is unquestioned.  But there are also cases of neighboring property owners who do not receive a direct benefit from the leases and have alleged injury to their persons or property as a result of oil and gas operations.[3]

---

[1] On October 6, 2014, the Township's Board of Supervisors (Supervisors) issued CNX Gas Company, LLC (CNX) a zoning compliance permit to install and operate an unconventional gas well on property located on a 330-acre parcel of land owned by John H. Slike and Anne E. Slike, known as the "Porter Pad."  Nonetheless, the Porter Pad is located only 730 feet from the residence of Beverly Taylor, 960 feet from the residence of Dolores Fredrick, and 1,200 feet from the residence of Patricia Hagaman.  The distance from the Porter Pad to the homes of these neighbors is significantly closer than it is to the home of the Slikes.  (Reproduced Record (R.R.) at 388a, 791a-92a, 899a, 903a.)

[2] "An oil and gas lease is considered a conveyance of a property interest."  *Shedden v. Anadarko E.&P. Co., L.P.*, 136 A.3d 485, 490 n.4 (Pa. 2016).

[3] *See, e.g.*, *Kiskadden v. Pennsylvania Department of Environmental Protection*, 149 A.3d 380, 382-85 (Pa. Cmwlth. 2016); *Ely v. Cabot Oil & Gas Corp.*, 38 F. Supp. 3d 518, 519 (M.D.

Nonetheless, the overall value or importance of oil and gas drilling has been documented in commentary and by the courts and the activity has its place in the history and tradition of the Commonwealth.[4]

Here, however, the legislative body of the Township ventured into uncharted, choppy waters when it enacted Ordinance 01-2010 (Ordinance) and authorized oil and gas drilling—literally, anywhere and everywhere within its borders—in an apparent attempt to obtain and turn the tides toward an optimal profit margin. Given the current state of the record, the Township has not adduced sufficient evidence to support such an extreme measure. Apart from this basis, a remand is further necessitated in light of our Supreme Court's relatively recent decision in *Pennsylvania Environmental Defense Foundation v. Commonwealth*, 161 A.3d 911 (Pa. 2017) (*PEDF*), where the Court reaffirmed the legal principles pronounced in *Robinson Township v. Commonwealth*, 83 A.3d 901 (Pa. 2013)

---

Pa. 2014); *see generally* Megan S. Haines, *Hydraulic Fracturing And Related Activities As Giving Rise To Classic Tort Claims In Pennsylvania*, 87 PA. B. ASS'N Q. 103, 103-04 (2016).

[4] *See, e.g.*, *Hite v. Falcon Partners*, 13 A.3d 942, 946 (Pa. Super. 2011) ("[W]e acknowledge that the parties' dispute is but one of many in a long line of cases involving the oil and gas industry in Pennsylvania—a fact which is hardly surprising, since the very first commercial oil well in the United States was drilled in Crawford County, Pennsylvania, in 1859."); *Ely*, 38 F. Supp. 3d at 524 ("The MSETC 2009 Report found that the economic impact of Marcellus Shale development during 2009 ranged between 23,385 and 23,884 jobs, and $3.1 and $3.2 billion in that year, including $1.2 billion in labor income, and almost $1.9 billion added to the Commonwealth's economy. The MSETC 2009 Report also found that this significant economic impact was likely to continue into future years, and that much of the economic benefit was being felt in small counties."); *see generally* Alison Peck, *Identity-Based Conflicts in Public Policy: The Case of Hydraulic Fracturing Policy in Pennsylvania*, 79 U. PITT L. REV. 437, 441 (2017) ("[T]he Article focuses on Pennsylvania, which is often held up in other jurisdictions, nationally and globally, as the poster child for fracking impacts, both positive and negative."); Joel R. Burcat, *The Ten Rules of Construction for Cases Involving Title Disputes under Pennsylvania Oil and Gas Law*, 87 PA. B. ASS'N Q. 171, 171-72 (2016).

(plurality)—principles which the Board failed to consider[5] and the trial court dismissed as non-binding and inapplicable.[6]

Hence, I respectfully dissent.

Dolores Frederick, Patricia Hagaman, and Beverly Taylor (collectively, Landowners) challenge the zoning compliance permit issued to CNX to develop an unconventional gas well, the "Porter Pad," in the Township's Agricultural/Residential District. Among other avenues, the Landowners attack the source of authority for the permit, the Ordinance, in its broad and global sense, and assert that it tramples on the rights guaranteed by the ERA. This constitutional proviso provides:

> The people have a right to clean air, pure water, and to the preservation of the natural, scenic, historic and esthetic values of the environment. Pennsylvania's public natural resources are the common property of all the people, including generations yet to come. As trustee of these resources, the Commonwealth shall preserve and maintain them for the benefit of all the people.

Pa. Const. art. I, §27.

In *PEDF*, the Pennsylvania Supreme Court overruled the three-fold test developed in *Payne v. Kassab*, 312 A.2d 86 (Pa. Cmwlth. 1973) (en banc), which the Board seemingly applied in this case,[7] as being "unrelated to the text of Section

---

[5] *See* Board's Conclusions of Law (COL) Nos. 32-34.

[6] *See* Trial court op. at 3.

[7] *See* Board's COL Nos. 8, 13-14, 25, 39; Findings of Fact (F.F.) Nos. 8, 13-14, 25, 51-54.

In *Payne*, this Court formulated a three-prong test for analyzing claims under the ERA, focusing on the following: (1) whether there has been compliance with all applicable statutes and regulations relevant to the protection of the Commonwealth's public natural resources, (2) whether the record demonstrates a reasonable effort to reduce the environmental incursion to a minimum,

27 and the trust principles animating it." 161 A.3d at 930. Relying upon and officially adopting the rationale of the lead opinion in *Robinson Township*, the Supreme Court determined that the proper standard of judicial review lies in the words of the ERA itself, as well as the underlying principles of Pennsylvania trust law in effect at the time of the enactment.

Pertinent here, and as noted by our Supreme Court, the third sentence of the ERA "establishes a public trust, pursuant to which the natural resources are the corpus of the trust, the Commonwealth is the trustee, and the people are the named beneficiaries." *Id.* at 931-32. "Trustee obligations are not vested exclusively in any single branch of Pennsylvania's government, and instead *all agencies and entities of the Commonwealth government, both statewide and local, have a fiduciary duty to act toward the corpus with prudence, loyalty, and impartiality*." *Id.* at 931 n.23 (emphasis added). Under the ERA, "the concept of public natural

---

and (3) whether the environmental harm which will result from the challenged decision or action so clearly outweighs the benefits to be derived therefrom that to proceed further would be an abuse of discretion.

Notably, on August 3, 2018, the Supreme Court vacated an unpublished panel decision from this Court, *Delaware Riverkeeper Network v. Middlesex Township Zoning Hearing Board* (Pa. Cmwlth., No. 1229 C.D. 2015, filed June 7, 2017) (*Delaware Riverkeeper Network*), and remanded for reconsideration in light of *PEDF*. *See* __ A.3d __ (Pa., No. 270 WAL 2017, filed August 3, 2018) (per curiam order). In *Delaware Riverkeeper Network*, we applied the *Payne* test to the landowners' assertion that the township contravened the ERA by permitting oil and gas operations in residential/agricultural districts and concluded that the claim failed. *Delaware Riverkeeper Network*, slip op. at 30-34.

The Supreme Court also vacated *Delaware Riverkeeper Network* and remanded for us to reconsider the relevance of its 4-3 decision in *Gorsline v. Board of Supervisors of Fairfield Township* (Pa., No. 270 WAL 2017, filed August 3, 2018). However, I do not find *Gorsline* to be instructive in this particular case because the ordinance in *Gorsline* did not allow oil and gas operations as a permitted use in any zoning district; the applicant sought a conditional use pursuant to a "savings clause" and the Court did not address a claim under the ERA.

PAM - 5

resources includes not only state-owned lands, waterways, and mineral reserves, but also resources that implicate the public interest, such as ambient air, surface and ground water, wild flora, and fauna (including fish) that are outside the scope of purely private property." *Robinson Township*, 83 A.3d at 955.

As a trustee, the Township has a duty to administer the trust with prudence, which involves consideration of the purposes and circumstances of the trust and requires the exercise of reasonable care, skill, and caution when dealing with the corpus of the trust. *PEDF*, 161 A.3d at 932 & n.24. More specifically, the ERA imposes upon the Township "*a duty to prohibit the degradation, diminution, and depletion of our public natural resources*, whether these harms might result from direct state action or from the actions of private parties." *Id.* at 933 (emphasis added). Indeed, the duties of a trustee are not limited to refraining from action that results in degradation or depletion of natural resources, but includes the affirmative duty to enact "legislation that adequately restrains actions of private parties likely to cause harm to protected aspects of our environment." *Robinson Township*, 83 A.3d at 979; *see id.* at 963. In this case, the drilling operations that occur on the Slikes' property are not inherently innocuous and the effects of such activity are not confined to private property interests. To the contrary, it is commonly known and understood that oil and gas operations, at least to a palpable extent, inevitably inflict "environmental and habitability costs" such as "air, water, and soil pollution; persistent noise, lighting, and heavy vehicle traffic." *Robinson Township*, 83 A.3d at 979.

Importantly, the Township "may not act as a mere proprietor, pursuant to which it deals at arms' length with its citizens, measuring its gains by the balance

sheet profits and appreciation it realizes from its resources operations." *Id.* at 932 (internal quotations marks and alterations omitted).

Here, the Township amended the zoning ordinance to allow "Oil and Gas Development," including drilling, hydraulic fracturing, and pipeline installation, in each and every one of the Township's 10 zoning districts (to the exclusion of none), making oil and gas operations a permitted principal use as of right in a variety of places that have a multitude of purposes. (R.R. at 203a-12a; *see* F.F. Nos. 5-6.)[8]  These districts include all the districts that are residential and

---

[8] Single-Family Residential District—the "purpose of this district is to provide for higher-density residential development in areas which have public water or public sewers or a community sewage disposal system." (R.R.) at 36a.)

Agricultural/Residential District—the "purpose of this district is to provide for agricultural uses and low-density residential development in rural areas." (R.R. at 39a.)

General Residential District—the "purpose of this district is to provide opportunities for establishing mobile home parks in appropriate locations in the Township and allowing for a mix of single-family and two-family dwellings." (R.R. at 43a.)

Planned Shopping Center District—the "purpose of this district is to provide retail shopping and service facilities to serve residents of the region." (R.R. at 47a.)

Neighborhood Business District—the "purpose of this district is to provide retail shopping service facilities to serve immediate household needs which are of a limited type and size appropriate to smaller properties." (R.R. at 50a.)

Highway Commercial District—the "purpose of this district is to provide for retail and service facilities which serve the needs of the general community and which are located in high volume traffic corridors." (R.R. at 53a.)

Light Industrial District—the "purpose of this district is to provide for light industrial uses in appropriate locations." (R.R. at 57a.)

Manufacturing District—the "purpose of this district is to provide for heavy industrial use in appropriate locations which have access to river and rail transportation." (R.R. at 61a.)

agricultural in nature, namely the Single-Family Residential District, the Agricultural/Residential District, the General Residential District, and, also, all the districts that are commercial in nature, *e.g.*, the Planned Shopping Center District, the Neighborhood Business District, and the Highway Commercial District. In fact, the Ordinance is so astonishing in its reach that it even authorizes Oil and Gas Development in the Riverfront Conservation District, the purpose of which is to "encourage public enjoyment of the riverfront and promote recreation and protection of the environment along the riverfront," (R.R. at 64a), and the Town Center District, which is described as "the heart of the community" and designed to provide "a sense of place, pedestrian-oriented development and community-oriented living." (R.R. at 89a.)

In its decision, the Board issued the following pertinent findings of fact:

59. Approximately 12,000 of the 20,000 total acres in the Township are leased to oil and gas operators. This represents more than 60 [percent] of the land mass of the Township.

60. In the R-2 District [*i.e.*, the Agricultural/Residential District], approximately 75 [percent] of the land mass is leased to oil and gas operators.

\* \* \*

---

Riverfront Conservation District—the "purpose of this district is to provide for a variety of uses which encourage public enjoyment of the riverfront and promote recreation and protection of the environment along the riverfront." (R.R. at 64a.)

Town Center—one of the purposes of this district is to "create a mixed-use zoning district designed to be the heart of the community that provides a sense of place, pedestrian-oriented development and community-oriented living." (R.R. at 89a.)

85.    John Slike testified that in the event he was unable to receive royalties from the gas well sites and the proposed Porter Pad, he would suffer financial hardship and substantial financial loss.  He further testified that in the event he is not able to receive royalties from the proposed Porter Pad, he would not have enough income to actively farm the property and keep his ground as open space.

\*        \*        \*

90.    Approximately 240 shallow gas wells are currently operating in all zoning districts within the Township.

\*        \*        \*

92.    Gas well drilling provides farmers and owners with income to sustain their businesses and way of life.

93.    Traditionally, farmers have used the income from gas wells to sustain the farm.

94.    The development of oil and gas is an essential part of the business plan of many small farmers.

95.    Leasing already has brought in excess of $12,000,000 in lease rentals to landowners of the Township in 2014.

96.    Drilling and production of the newly-leased properties alone will add an estimated additional $60—90 million in income.

(Board's Findings of Fact (F.F.) Nos. 59, 60, 85, 90, 92-96.)

Based upon these facts, and after determining that residents will be able to keep their farms and that the Township will continue to receive prominent income as a result of oil and gas development, (Board's COL Nos. 10-11), the Board made the following conclusion of law:

PAM - 9

> 21. Here, the Township acted within its constitutional police power in enacting the [Ordinance] to further the general welfare of its citizens **by permitting them to benefit economically** from oil and gas resources and royalties, in order to help their livelihood and way of life.

(Board's COL No. 21) (emphasis added).

Conceptually, the ERA is designed to be proactive rather than reactive, and may be "invoked to provide anticipatory and preventative protection against unreasonable degradation of natural resources." *Robinson Township*, 83 A.3d at 953 (citing and parenthetically describing *Montana Environmental Information Center v. Department of Environmental Quality*, 988 P.2d 1236, 1249 (Mont. 1999) (*MEIC*)). Under this standard, the Landowners' ERA claim is cognizable and worthy of relief, "even absent a demonstration that public health is threatened or that current [] quality standards are affected to such an extent that a significant impact has been had" on the environment. *MEIC*, 988 P.2d at 1249.[9] The fact that the Board issued the permit (and therefore the green light) to CNX to install and operate the Porter Pad on property located in the Agricultural/Residential District, in conjunction with the record as it currently stands, is enough to prove a violation of the ERA and shift the burden of proof and persuasion to the Township. *See id.*; *cf. Northern Plains Resource Council, Inc. v. Montana Board of Land Commissioners*,

---

[9] In interpreting the state's constitutional environmental rights provision, the Supreme Court of Montana stated: "The delegates did not intend to merely prohibit that degree of environmental degradation which can be conclusively linked to ill health or physical endangerment. Our constitution does not require that dead fish float on the surface of our state's rivers and streams before its farsighted environmental protections can be invoked." *MEIC*, 988 P.2d at 1249; *accord Robinson Township*, 83 A.3d at 963 ("The drafters and the citizens of the Commonwealth who ratified the [ERA], aware of this history, articulated the people's rights and the government's duties to the people in broad and flexible terms that would permit not only reactive but also anticipatory protection of the environment for the benefit of current and future generations."). Apparently, the Majority employs a different approach. *See* Maj. Op. at 33.

288 P.3d 169, 174-75 (Mont. 2012); *see also Robinson Township*, 83 A.3d at 975, 979.

On its face, it is readily apparent that, just like section 3304 of Act 13,[10] which the Supreme Court found to be unconstitutional in *Robinson Township*, "the purpose of the [Ordinance] is to provide a maximally favorable environment for industry operators to exploit Pennsylvania's oil and natural gas resources." *Id.* at 975. Notably, our Supreme Court has already observed:

> The public natural resources implicated by the "optimal" accommodation of industry here are resources essential to life, health, and liberty: surface and ground water, ambient air, and aspects of the natural environment in which the public has an interest . . . . [D]evelopment of the natural gas industry in the Commonwealth unquestionably has and will have a lasting, and undeniably detrimental, impact on the quality of these core aspects of Pennsylvania's environment, which are part of the public trust.

*Id.* As applied, the Ordinance is the means by which the Township has thus far devoted more than half of its surface area to oil and gas development; three-fourths of the Residential/Agricultural District is saturated with oil and gas leases; and both the Township and its residents have received significant sums of income. (F.F. Nos. 59-60, 95-96.)

However, the Township "may not act as a mere proprietor," *PEDF*, 161 A.3d at 931, and the Ordinance cannot allow or encourage the degradation or depletion of public natural resources. *Id.* at 933; *Robinson Township*, 83 A.3d at 975. In one vital respect, the Ordinance functions the same way as section 3304 of Act 13 did in *Robinson Township*, a state statute that "introduce[d] heavy-duty industrial uses—natural gas development and processing []—into all existing zoning

---

[10] 58 Pa.C.S. §3304.

districts as of right, including residential, agricultural, and commercial." 161 A.3d at 937. Focusing on this feature of section 3304, the Supreme Court in *Robinson Township* noted that the statute's "primary [] purpose is not to effectuate the constitutional obligation to protect and preserve Pennsylvania's natural environment," *id.* at 975, and said that "permitting industrial uses as a matter of right in every type of [] zoning district is incapable of conserving or maintaining the constitutionally-protected aspects of the public environment and of a certain quality of life." *Id.* at 979. Ultimately, the Court determined that section 3304 "degrades the corpus of the trust," *id.* at 980, and discarded the statute as flouting the ERA, specifically as an "unauthorized use of the public trust assets," and did so assuming that the trustee has acted "solely and in good faith to advance the economic interests of the beneficiaries." *Id.* at 982.

Given its monumental breadth, over-inclusiveness, and the practical results it has created, the Ordinance, which was passed into law prior to section 3304 of Act 13, (F.F. No. 42), is nonetheless a microcosm of section 3304, duplicating a critical flaw of the statute—*i.e.*, permitting oil and gas operations in all districts—and clearly jeopardizing the "inherent and indefeasible" rights guaranteed by the ERA. *PEDF*, 161 A.3d at 931. Consequently, the Ordinance should be subjected to strict scrutiny and analysis in the same manner that courts provide to other fundamental rights, *see MEIC*, 988 P.2d at 1245-46, and the Township should be obligated to prove that the Ordinance is narrowly tailored to effectuate its economic interests and that it reflects the least onerous path that can be taken to achieve the

objective without an unreasonable degradation of the environment. *See also Robinson Township*, 83 A.3d at 954.[11]

---

[11] The general rule is that the moving party carries the burden of proving that an ordinance is unconstitutional. *See, e.g.*, *In re Bartkowski Investment Group, Inc.*, 106 A.3d 230, 238 (Pa. Cmwlth. 2014). However, when an ordinance "burdens," "infringes," or "significantly interferes" with a fundamental constitutional right (in this case, the ERA), strict scrutiny analysis is applicable, and the burden shifts to the government to prove that the ordinance "furthers a compelling interest and is narrowly tailored to achieve that interest." *Reed v. Town of Gilbert*, ___ U.S. ___, 135 S. Ct. 2218, 2231 (2015); *see, e.g.*, *Citizens United v. Federal Election Commission*, 558 U.S. 310, 312 (2010) ("Laws that burden political speech are subject to strict scrutiny, which requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest."); *Zablocki v. Redhail*, 434 U.S. 374, 388 (1978) ("When a statutory classification significantly interferes with the exercise of a fundamental right, it cannot be upheld unless it is supported by sufficiently important state interests and is closely tailored to effectuate only those interests."); *Nixon v. Commonwealth*, 839 A.2d 277, 287 (Pa. 2003) ("Where laws infringe upon certain rights considered fundamental, such as the right to privacy, the right to marry, and the right to procreate, courts apply a strict scrutiny test. Under that test, a law may only be deemed constitutional if it is narrowly tailored to a compelling state interest."); *cf. Towery v. Brewer*, 672 F.3d 650, 659-60 (9th Cir. 2012) (rejecting "a distinction between state action that *violates* a fundamental right and state action that merely *burdens* a fundamental right.") (emphasis in original).

As noted above, the ERA contains "fundamental rights reserved to the people in Article I of our Constitution" and is one of our "inherent and indefeasible" rights. *PEDF*, 161 A.3d at 930-31. The Supreme Court of Montana in *MEIC*, a case cited in *Robinson Township*, held: "[W]e conclude that the right to a clean and healthful environment is a fundamental right because it is guaranteed by the Declaration of Rights found [in] Montana's Constitution, and that any statute or rule which implicates that right must be strictly scrutinized." *See Robinson Township*, 83 A.3d at 962 ("The decision to affirm the people's environmental rights in a Declaration or Bill of Rights, alongside political rights, is relatively rare in American constitutional law. In addition to Pennsylvania, Montana and Rhode Island are the only other states of the Union to do so.").

Pursuant to this standard, the Landowners must first demonstrate that the language of the Ordinance, and/or the evidence of record shows that the Ordinance, has the effect of burdening, infringing, or sufficiently implicating the rights of the ERA. *See Washington v. Glucksberg*, 521 U.S. 702, 722 (1997) (reiterating the "threshold requirement—that a challenged state action implicate a fundamental right—before requiring more than a reasonable relation to a legitimate state interest to justify the action."); *Tunstall v. Bergeson*, 5 P.3d 691, 704 (Wash. 2000) ("[W]e must first find that a fundamental right is being infringed [because] infringement of a fundamental

First, aside from the deficiency noted above, section 3304 of Act 13 also contained an infirmity because it commandeered municipalities and deprived them of the ability to pick and choose which districts within its realm are suitable for oil and gas operations based on "environmental and habitability burdens." *Robinson Township*, 83 A.3d at 980. However, there is nothing in the record or Ordinance to positively and substantively indicate that the Township made any kind of exclusionary choice or engaged in any meaningful and individualized assessment of its districts' particular characteristics.

To the contrary, the "requirements" for a zoning compliance permit apply uniformly to all the districts. Significantly, some of these obligations do not appear to be mandatory and are instead left to the discretion of the oil and gas operator; *e.g.*, "*[o]perator shall strive to consider location of its temporary and permanent operations, where prudent and possible, so as to minimize interference*

---

right *is* a legal requirement to applying strict scrutiny review . . . . In other words, finding an infringement of the fundamental right is a necessary predicate to determining whether that right was *impermissibly* infringed.") (emphasis in original).

For the reasons discussed above, and further elaborated upon below, I would conclude that Landowners have met this initial burden, and that the Township should therefore shoulder the burden of demonstrating that the Ordinance is narrowly tailored to a compelling state interest. Notably, the Township would have to "establish a close fit between the challenged zoning regulations and the actual public benefits they serve . . . with actual evidence, not just assertion," and would have to adduce evidence that fairly support the rationale for the Ordinance. *Ezell v. City of Chicago*, 846 F.3d 888, 894 & 896 (7th Cir. 2017). If the Township could sustain this burden, then regardless of the degree to which the Ordinance burdens the rights conferred by the ERA, the Ordinance would be deemed to be constitutional. *See Boy Scouts of America v. Dale*, 530 U.S. 640, 648 (2000) ("But the freedom of expressive association, like many freedoms, is not absolute. We have held that the freedom could be overridden by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms.") (internal quotation marks omitted); *Binderup v. Attorney General*, 836 F.3d 336, 344 (3d Cir. 2016) (en banc).

*with Township residents' enjoyment of their property*"; and "*[o]perator shall take steps, to the extent practicable to direct lighting downward and inward.*" (R.R. at 206a) (emphasis added). Further, an oil and gas operator is mandated to install a chain link fence and warning signs, secure the presence of a security guard when the location of the well is within 1,000 feet of a "Protected Structure," such as an occupied residence, commercial business, or school, and provide courtesy information to residents located within 1,000 feet of the well. (R.R. at 204a, 206a-08a.) However, the Ordinance does not contain a setback requirement and entrusts this determination to state agencies and/or the shifting sands of the legislation of our General Assembly, as evidenced by what was formerly the Oil and Gas Act[12] and is now known as Act 13. *See* F.F. No. 64; R.R. at 207a; *Robinson Township v. Commonwealth*, 52 A.3d 463, 468 (Pa. Cmwlth. 2012) (en banc), *aff'd in part and rev'd in part other grounds by* 83 A.3d 901 (Pa. 2013). Notably, the Oil and Gas Act was in effect when the Ordinance was passed but was later repealed and replaced by Act 13; and, even assuming the Ordinance could incorporate the setback distances contained in future legislation, the distance requirements in Act 13 have been declared unconstitutional or non-severable from the portions of Act 13 that are unconstitutional.[13] *So, as it now stands, the Ordinance technically does not have any minimal setback distance requirements at all. None.*

---

[12] Act of December 19, 1984, P.L. 1140, *as amended*, *formerly* 58 P.S. §§601.101-601.605, repealed by the Act of February 14, 2002, P.L. 87.

[13] *See Robinson Township v. Commonwealth*, 147 A.3d 536, 565-66 (Pa. 2016) ("Given the absence of those statutory provisions, municipalities may again, as they did prior to the passage of Act 13, regulate the environmental impact, setback distances, and the siting of oil and gas wells in land use districts through local ordinances.").

Hence, with respect to potential environmental concerns, it appears that the Ordinance delegates (or rather, punts) any consideration of these matters to the Department of Environmental Protection and other state agencies during the permitting process. (F.F. Nos. 9, 24; R.R. at 207a.) In fact, the Ordinance is so devoid and wanting, as explained herein, it does not even have any setback distance requirements and essentially defers to the oil and gas company's choice of location. The Township's failure to consider the environment in an adequate fashion renders the Supreme Court's decision in *Robinson Township* on par with the facts and circumstances of this case. Because the Township must "reasonably account for the environmental features of the affected locale," *Robinson Township*, 83 A.3d at 953, and the record is insufficient to prove that it has, the Township, as a threshold matter, should have to demonstrate with competent evidence that oil and gas operations are compatible in *all* of its zoning districts given the districts' unique characteristics and permitted uses.[14, 15]

---

[14] To an extent, this portion of an ERA claim based on a trustee theory seems to have substantial overlap with a claim grounded "in the first initial, prohibitory clause of Section 27—[] the declared 'right' of citizens to clean air and pure water, and to the preservation of natural, scenic, historic and esthetic values of the environment." *Robinson Township,* 83 A.3d at 951; *see id.* at 952 ("The corollary of the people's Section 27 reservation of right to an environment of quality is an obligation on the government's behalf to refrain from unduly infringing upon or violating the right, including by legislative enactment or executive action. Clause one of Section 27 *requires each branch of government to consider in advance of proceeding the environmental effect of any proposed action on the constitutionally protected features*." (emphasis added)), *and compare with id.* at 963.

[15] The Majority notes that none of the Landowners live on or own property in districts other than the R-2 District. Maj. Op. at 30 n.38. However, the Landowners presented a global challenge to the Ordinance, contesting its constitutionality, in large part, by emphasizing that the Ordinance permits oil and gas operations in all the zoning districts. It does not appear that the Township contested the Landowners' standing in this regard; accordingly, the Majority not only raises a non-issue but it does so *sua sponte*. *See In re Paulmier*, 937 A.2d 364, 368 n.1 (Pa. 2007) (reciting

Second, assuming the Township can satisfy the above standard, the Township should further demonstrate that it is indispensably necessary for *all* of its zoning districts to be open to oil and gas development to attain the economic well-being of *all* its citizenry. *See PEDF*, 161 A.3d at 932. This is especially warranted in view of the fact that "farms" are a permitted use in only the Agricultural/Residential District, and the Township, as trustee, has a duty to maintain impartiality and to treat all beneficiaries equally and without favoritism. *See In re Estate of Weiss*, 309 A.2d 793, 799 (Pa. 1973). In more precise terms, if the Township relies on the financial benefit the Ordinance confers upon the farmers as its stated objective for—and compelling interest to support—the Ordinance, the Township should provide adequate justification for the differential treatment among its citizens and prove that oil and gas operations in the districts other than the Residential/Agricultural District will substantially further the business interest of the farmers. Otherwise, if the Township asserts that its objective for and compelling interest in the Ordinance resides in the financial benefit the law bestows upon the citizenry as a whole, the Township should have to prove that inclusion of commercial districts actually furthers or has the potential to further that interest. The Township has not satisfied these criteria, and hence, the Ordinance cannot be deemed to be the least restrictive means and fails strict scrutiny.

Third, and irrespective of the above, the facts of this case create cause for grave concern for the Agricultural/Residential District in particular, which now must be close to being fully occupied by oil and gas producers. Under trust law, a trustee possesses a duty to the beneficiaries to keep an accurate account of the affairs

that challenges to standing are waivable); *Hertzberg v. Zoning Board of Adjustment of the City of Pittsburgh*, 721 A.2d 43, 46 n.6 (Pa. 1998) ("Because the question of standing is not an issue of subject matter jurisdiction, we cannot raise it *sua sponte*.").

of the trust and its corpus, *In re Estate of Nesbitt*, 533 A.2d 1015, 1021 (Pa. Super. 1987), and a "beneficiary may by a proper proceeding compel the trustee to render to the proper court an account of the administration of the trust." Restatement (Second) Trusts, §172, *cmt. c.* (Am. Law Inst. 1959). At this point in time, the Township should have to account for the public resources it holds in trust and establish that the oil and gas operations in the Agricultural/Residential District have not resulted in a negative effect on the environment as a matter of scientific fact.[16]

Because the Township has not made the evidentiary showings just outlined, I would vacate the order below and remand to the to the trail court to remand to the Board to provide the Township with the opportunity to satisfy its burden and for the Landowners to present any rebuttal evidence.[17] The Majority glosses over the Landowners' ERA claim and dismisses it in short thrift. I cannot.

Accordingly, I respectfully dissent.

_____
PATRICIA A. McCULLOUGH, Judge

---

[16] This would not require, as the Majority contends, that the Township prove a negative. Maj. Op. at 31 n.38. Rather, it merely places the burden on the Township, in light of the deficiencies and overarching reach of the Ordinance, to carry its rebuttal burden of demonstrating through scientific evidence that no unreasonable harm has occurred to the environment. Of course, such evidence is obtainable and readily available.

[17] I do not suggest that, on remand, the parties engage in a fishing expedition in an attempt to unearth evidence regarding the deliberations or intentions of the Supervisors in enacting the Ordinance. Aside from the fact that these issues are irrelevant for purposes of the present ERA challenge, it would be ill-conceived to think that the Supervisors' true intent in enacting the Ordinance was to decimate the environment and obliterate the rights of the ERA.

Dolores Frederick, Patricia Hagaman, :
and Beverly Taylor, :
                Appellants :
                     :
        v. :
                     :
Allegheny Township Zoning Hearing :
Board :
                     :
        v. : No. 2295 C.D. 2015
                     : ARGUED: February 7, 2018
CNX Gas Company, LLC :
                     :
        v. :
                     :
Allegheny Township :
                     :
        v. :
                     :
John H. Slike and Anne E. Slike, :
Northmoreland Farms LP :
                     :
        v. :
                     :
Michael Golembeiwski and Lisa :
Golembeiwski, John P. Brunner, II, :
Esq., Jeffrey and Sheila Brunner, :
Miller Niksic, Joanne Resh, Richard :
and Patricia Trumble, Michael and :
Jacalyn Schumaker :

BEFORE:    HONORABLE MARY HANNAH LEAVITT, President Judge
               HONORABLE RENÉE COHN JUBELIRER, Judge
               HONORABLE P. KEVIN BROBSON, Judge
               HONORABLE PATRICIA A. McCULLOUGH, Judge
               HONORABLE ANNE E. COVEY, Judge
               HONORABLE MICHAEL H. WOJCIK, Judge
               HONORABLE ELLEN CEISLER, Judge

DISSENTING OPINION
BY JUDGE CEISLER                         FILED: October 26, 2018

While I agree with much of the majority's reasoning, I take issue with its conclusion that Zoning Ordinance 01-2010 does not violate the Environmental Rights Amendment and, therefore, respectfully register my dissent. The Environmental Rights Amendment reads as follows:

> The people have a right to clean air, pure water, and to the preservation of the natural, scenic, historic and esthetic values of the environment. Pennsylvania's public natural resources are the common property of all the people, including generations yet to come. As trustee of these resources, the Commonwealth shall conserve and maintain them for the benefit of all the people.

PA. CONST. art. I, §27.

> This constitutional provision grants two separate rights to the people of this Commonwealth. The first right is contained in the first sentence, which is a prohibitory clause declaring the right of citizens to clean air and pure water, and to the preservation of natural, scenic, historic and esthetic values of the environment. This clause places a limitation on the state's power to act contrary to this right, and while the subject of this right may be amenable to regulation, any laws that unreasonably impair the right are unconstitutional. *Id.*
>
> The second right reserved by [the Environmental Rights Amendment], set forth in its second sentence, is the common ownership by the people, including future generations, of Pennsylvania's public natural resources.
>
> . . .
>
> The third clause of [the Environmental Rights Amendment] establishes a public trust, pursuant to which the natural resources are the corpus of the trust, the Commonwealth is the trustee, and the people are the named beneficiaries.

*Pennsylvania Envtl. Def. Found. v. Com.* (*PEDF II*), 161 A.3d 911, 931-32 (Pa. 2017) (citations and footnote omitted). Thus, the Commonwealth, as trustee, has a fiduciary obligation:

to comply with the terms of the trust and with standards governing a fiduciary's conduct. The explicit terms of the trust require the government to "conserve and maintain" the corpus of the trust. *See* PA. CONST. ART. I, § 27. The plain meaning of the terms conserve and maintain implicates a duty to prevent and remedy the degradation, diminution, or depletion of our public natural resources. As a fiduciary, the Commonwealth has a duty to act toward the corpus of the trust—the public natural resources—with prudence, loyalty, and impartiality.

*Id.* at 932 (quoting *Robinson Twp., Washington Cty. v. Com.,* 83 A.3d 901, 956-7 (Pa. 2013)). The term "Commonwealth," as used here, "encompasses all agencies and entities of the Commonwealth government, both statewide and local," meaning that each one has "a fiduciary duty to act toward the corpus with prudence, loyalty, and impartiality." *Id.* at 928 n.23.

Our Supreme Court, referencing Pennsylvania trust law, has interpreted the Environmental Rights Amendment to

impose[ ] two basic duties on the Commonwealth as the trustee. First, the Commonwealth has a duty to prohibit the degradation, diminution, and depletion of our public natural resources, whether these harms might result from direct state action or from the actions of private parties. Second, the Commonwealth must act affirmatively via legislative action to protect the environment. Although a trustee is empowered to exercise discretion with respect to the proper treatment of the corpus of the trust, that discretion is limited by the purpose of the trust and the trustee's fiduciary duties, and does not equate to mere subjective judgment.

*Id.* at 932-33. Consequently, the Township, as a local component of our Commonwealth's government, must act in accordance with these duties as trustee of the environment and the public natural resources within its domain. Furthermore, the Township must pursue "not only reactive but also anticipatory protection of the environment [and public natural resources] for the benefit of current and future

generatons." *Id.* at 919 (quoting *Robinson Twp.*, 83 A.3d at 963); *see id.* at 931 ("The second right reserved by [the Environmental Rights Amendment], set forth in its second sentence, is the common ownership by the people, including future generations, of Pennsylvania's public natural resources."); *Robinson Twp.*, 83 A.3d at 959.[1]

While the majority opines that the Slikes' property is neither public in nature, nor held in trust by the Township, I believe this misses the point and incorrectly narrows the scope of the Township's environmental trustee duties. As former Chief Justice Castille noted in his *Robinson Township* plurality opinion,

> [a]t present, the concept of public natural resources includes not only state-owned lands, waterways, and mineral reserves, but also resources that implicate the public interest, such as ambient air, surface and ground water, wild flora, and fauna (including fish) that are outside the scope of purely private property.

*Robinson Twp.*, 83 A.3d at 955 (citing numerous statutory provisions). Thus, the Township has an affirmative duty to ensure that these kinds of resources are properly conserved and protected, regardless of whether they are found on private or public land, and whether the harm or threat thereto comes from private entities or an apparatus of the Commonwealth government itself. In short, the fact that the Porter Pad sits on private land does not halt the Environmental Rights Amendment's applicability, or the Township's trustee responsibilities, at the Slikes' property line.[2]

---

[1] "Within the public trust paradigm of [the Environmental Rights Amendment], the beneficiaries of the trust are 'all the people' of Pennsylvania, including generations yet to come. The trust's beneficiary designation has two obvious implications: first, the trustee has an obligation to deal impartially with all beneficiaries and, second, the trustee has an obligation to balance the interests of present and future beneficiaries." *Robinson Twp.*, 83 A.3d at 959.

[2] Our Court has, in the past, expressed a clear desire to limit the *Robinson Township* plurality's persuasive power as much as possible. *See Pennsylvania Envtl. Def. Found. v. Com.*,

The majority also concludes that Appellants failed to meet their evidentiary burden in the context of their Environmental Rights Amendment-based argument. I share the majority's concerns regarding Appellants' proffered evidence and recognize that the Zoning Board was the fact-finder in this matter, with exclusive authority to both weigh evidence and make credibility determinations. *Hellam Twp. v. Hellam Twp. Zoning Hearing Bd.*, 941 A.2d 746, 749 (Pa. Cmwlth. 2008). However, I believe focusing on these points puts the cart before the horse, skipping over the very reason for my dissent: Zoning Ordinance 01-2010 *facially* violates the Environmental Rights Amendment.[3]

Our Commonwealth's history, the Environmental Rights Amendment's purpose, and the very nature of the challenged Ordinance compel this conclusion.

> It is not a historical accident that the Pennsylvania Constitution now places citizens' environmental rights on par with their political rights . . . [for our Commonwealth] has a notable history of what appears retrospectively to have been a shortsighted exploitation of its bounteous environment, affecting its minerals, its water, its air, its flora and fauna, and its people. The lessons learned from that history led directly to the Environmental Rights Amendment, a measure which received overwhelming

---

108 A.3d 140, 156 (Pa. Cmwlth. 2015), *rev'd in part, vacated in part sub nom. PEDF II,* 161 A.3d 911 ("For our purposes, we find the [*Robinson Township*] plurality's construction of [the Environmental Rights Amendment] persuasive only to the extent it is consistent with binding precedent from this Court and the Supreme Court on the same subject."). However, given the Supreme Court's *PEDF II* opinion, in which the majority liberally quotes and repeatedly cites *Robinson Township*, *see PEDF II*, 161 A.3d at 916-19, 929-38, & n.20, 21, & 23, I believe we must now recognize that authority of former Chief Justice Castille's plurality opinion has been greatly enhanced.

[3] "A strong presumption of validity and constitutionality attaches to any lawfully enacted zoning ordinance and a heavy burden is on the [challenger] to prove facial invalidity of such ordinance. In order to overcome this burden, the [challenger] must prove that the ordinance is clearly, palpably, and plainly unconstitutional." *Atl. Ref. & Mktg. Corp. v. Bd. of Comm'rs of York Twp.*, 608 A.2d 592, 594 (Pa. Cmwlth. 1992) (internal citation omitted).

support from legislators and the voters alike. When coal was "King," there was no Environmental Rights Amendment to constrain exploitation of the resource, to protect the people and the environment, or to impose the sort of specific duty as trustee upon the Commonwealth as is found in the Amendment. Pennsylvania's very real and mixed past is visible today to anyone travelling across Pennsylvania's spectacular, rolling, varied terrain. The forests may not be primordial, but they have returned and are beautiful nonetheless; the mountains and valleys remain; the riverways remain, too, not as pure as when William Penn first laid eyes upon his colonial charter, but cleaner and better than they were in a relatively recent past, when the citizenry was less attuned to the environmental effects of the exploitation of subsurface natural resources. But, the landscape bears visible scars, too, as reminders of the past efforts of man to exploit Pennsylvania's natural assets. Pennsylvania's past is the necessary prologue here: the reserved rights, and the concomitant duties and constraints, embraced by the Environmental Rights Amendment, are a product of our unique history. . . .

[H]istory[, however,] seem[s] to [be] repeat[ing] itself: an industry, offering the very real prospect of jobs and other important economic benefits, seeks to exploit a Pennsylvania resource, to supply an energy source much in demand. . . . ***By any responsible account, the exploitation of the Marcellus Shale Formation will produce a detrimental effect on the environment, on the people, their children, and future generations, and potentially on the public purse, perhaps rivaling the environmental effects of coal extraction.*** The litigation response was not available in the nineteenth century, since there was no Environmental Rights Amendment. The response is available now.

*Robinson Twp.*, 83 A.3d at 960, 976 (emphasis added). In essence, the recent

hydrocarbon extraction boom, which is occurring throughout portions of this

Commonwealth that overlay the Marcellus Shale Formation,[4] stands ready to wreak havoc of similar class and character as those booms which stripped our forests bare, hunted our wildlife to near-or-actual extinction, and poisoned or scarred our air, land, and water. It is incumbent upon all levels of Commonwealth government, by virtue of the trustee responsibilities imposed by the Environmental Rights Amendment, to ensure that this potential does not become a reality.

Here, Appellants claim that Zoning Ordinance 01-2010

> permits industrial and environmentally intensive unconventional development in all zoning districts, by right without public hearing or the attachment of tailored conditions, and with very little to any local health, safety, and welfare regulations. Given this zoning structure, it is obvious that the Township cannot consider in advance of proceeding the environmental effect of any proposed action when granting zoning approval of any particular unconventional development as permission is simply given as of right. . . . How [can the] Township carry[ ] out its trustee duty to act affirmatively to protect the environment, via legislative action, given [that Zoning Ordinance 01-2010] permit[s] this environmentally intensive use everywhere [throughout the Township]?

Appellants' Brief at 47-48 (quotation marks omitted). How indeed. This Ordinance allows "Oil and Gas Development," which is defined so as to encompass a vast

---

[4] *See* Dr. Olga Popova, *Marcellus Shale Play: Geology Review* at 2-4, U.S. ENERGY INFORMATION ADMINISTRATION (January 2017), *available at* https://www.eia.gov/maps/pdf/MarcellusPlayUpdate_Jan2017.pdf discussing and illustrating geographic area covered by Marcellus Shale Formation); Ellen M. Gilmer, *'Topsy-turvy' legal landscape in aftermath of nixed Pa. drilling law*, E&E NEWS (November 25, 2014), https://www.eenews.net/stories/1060009504/print (last visited August 6, 2018) ("Allegheny Township sits atop the Marcellus Shale formation, where hydraulic fracturing and horizontal drilling have sparked a nationwide gas boom.").

universe of activities,[5] anywhere in the Township by-right and subject mainly to only open-ended and vaguely worded conditions. *See* Zoning Ordinance 01-2010 §§ 3, 3(2)-3(4), 3(7)-3(9), 3(14)-3(15), 3(18) (general strictures for by-right Oil and Gas Development in the Township pertaining to brush, tree, and tree stump disposal; dust control; effects of such development upon other properties; lighting; noise; road safety; sanitation; and time of day during which pre-drilling construction activity is allowed). Furthermore, it is silent regarding when or for how long drilling may take place (theoretically allowing round-the-clock activities in perpetuity once construction has been completed), offers no mechanism by which Township residents or other interested parties might offer their input during the permitting process, and is completely devoid of language addressing the long-term primary, secondary, or tertiary effects of such development. Given this state of affairs, it is simply impossible for the Township, when considering an Oil and Gas Development permit request, to appropriately weigh the interests of the property owner and of the broader Township community, or those of present Township residents and of generations-to-come, or protect the environment and preserve public interest-

---

[5]     **Oil and Gas Development or Development.** The well site preparation, well site construction, drilling, hydraulic fracturing, and/or site restoration associated with an Oil and Gas well of any depth; water and other fluid storage, impoundment and transportation used for such activities; and the installation and use of all associated equipment, including tanks, meters, and other equipment and structures whether permanent or temporary; and the site preparation, construction, installation, maintenance and repair of Oil and Gas pipelines and associated equipment and other equipment and activities associated with the exploration for, production and transportation of Oil and Gas other than Natural Gas Compressor Stations and Natural Gas Processing Plants or facilities performing the equivalent functions that operate as midstream facilities.

Zoning Ordinance 01-2010 § 2 (emphasis in original).

implicating natural resources over both the short term and the long haul. Therefore, I believe Zoning Ordinance 01-2010 clearly, palpably, and plainly violates the Environmental Rights Amendment, as the Ordinance manifestly fails to comport with the Township's duties as environmental trustee of all the public natural resources within its domain, and would grant this appeal on that basis.

_____
ELLEN CEISLER, Judge