IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Protect PT,                                 :
                                            :
                        Appellant           :
                                            :
            v.                              : No. 576 C.D. 2019
                                            : Argued: February 13, 2020
Penn Township Zoning Hearing                :
Board and Olympus Energy LLC                :


BEFORE:    HONORABLE PATRICIA A. McCULLOUGH, Judge
           HONORABLE MICHAEL H. WOJCIK, Judge (P.)
           HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge

OPINION NOT REPORTED

MEMORANDUM OPINION
BY JUDGE WOJCIK                              FILED: July 6, 2020


            Protect PT (Objector) appeals the order of the Westmoreland County
Court of Common Pleas (trial court) denying its appeal, and upholding the decision
of the Penn Township Zoning Hearing Board (Board), that granted the special
exception application of Olympus Energy LLC (Applicant)[1] to develop oil and gas
operations (unconventional gas wells)[2] at its Metis Well Pad in Penn Township
(Township), Westmoreland County, subject to a number of conditions. We affirm.

---

[1] At the time of application, Applicant was Huntley & Huntley Energy Exploration, LLC
(Huntley). However, by October 15, 2019 order, this Court granted Applicant's application to
amend the caption of this appeal because Huntley changed its name to Olympus Energy LLC
effective September 25, 2019.

[2] Section 190-202 of the Penn Township Zoning Ordinance Number 912-2016 (Zoning
Ordinance) defines "Oil and Gas Operations (unconventional gas wells)," in pertinent part, as
including "[w]ater and other fluid storage or impoundment areas used exclusively for . . . gas
**(Footnote continued on next page…)**

In 2017, Applicant filed an application for a special exception to develop unconventional gas wells on a 197.5-acre property located at 1260 Harrison City-Export Road in the Township. The parcel is located in a Mineral Extraction Overlay (MEO) Zoning District[3] of the Township's Rural Resource

_____

**(continued…)**

operations." Section 190-202 also defines "Wastewater (Unconventional Well)" as "[t]he post-drilling liquids or fluids used in the fracking or extraction process."

[3] Section 190-407(A) of the Township's Zoning Ordinance defines the purpose of the MEO Zoning District as follows:

> The purpose of the MEO [] District is to provide areas for the extraction of minerals as defined by the Commonwealth, where the population density is low and significant development is not projected for the near future. Uses permitted in the MEO District shall comply with the provisions of §190-635, Performance Standards, and §190-641, [Oil and Gas Operations (Unconventional Gas Wells),] as well as with the "Surface Mining Conservation and Reclamation Act," [Act of May 31, 1945, P.L. 1198, *as amended*, 52 P.S. §§1396.1-1396.31,] the "Noncoal Surface Mining Conservation and Reclamation Act," [Act of December 19, 1984, P.L. 1093, *as amended*, 52 P.S. §§3301-3326,] the "Oil and Gas Act," [58 Pa. C.S. §§3201–3274], and the "Bituminous Mine Subsidence and Land Conservation Act," [Act of April 27, 1966, P.L. 31, *as amended*, 52 P.S. §§1406.1-1406.21].

Additionally, Section 190-202 defines "Special Exception" as "[a] use which is subject to approval by the [Board] when there is a specific provision for such special exception made in this chapter." Section 190-407(E) specifically provides for "[o]il and natural gas drilling (unconventional)" as a permitted use by special exception in the MEO Zoning District.

Further, Section 190-407(G)(3), (4), and (9) provides:

> G. Development standards: In addition to the applicable performance standards in §190-635, any permitted . . . special exception . . . shall be subject to the following:

**(Footnote continued on next page…)**

(continued…)

* * *

(3) Wastewater: Copies of all required Pennsylvania [Department of Environmental Protection (DEP)] permits or permits from the Municipal Authority with jurisdiction agreeing to accept any effluent produced shall be provided that cannot be treated on-site[, which] shall not be permitted to accumulate and shall be disposed of on a regular basis as required.

(a) In no case shall wastewater be dumped or permitted as flow or seep into a stream or drainage way.

(b) Wastewater that cannot be treated on-site shall not be permitted to accumulate and shall be disposed of on a regular basis as required.

(4) Hazardous or toxic waste: Hazardous or toxic waste shall not be permitted to accumulate on any property, and disposal shall be in compliance with applicable Commonwealth of Pennsylvania hazardous or toxic waste handling regulations.

* * *

(9) Air quality: Air-contaminant emissions shall comply with all municipal, county, commonwealth and federal regulations, and all applicable regulations for smoke, ash, dust, fumes, gases, odors and vapors.

Section 190-641(A), (C)(1), and (D) of the Township's Zoning Ordinance provides, in pertinent part:

A. Oil and gas operations, which include the drilling of . . . natural gas wells in the MEO [] District, . . . shall be reviewed and approved by the [Board] as a special exception prior to the issuance of any required Township permits.

**(Footnote continued on next page…)**

3

**(continued…)**

* * *

C. Where such oil and gas operations are classified as a special exception . . . the following review procedure and submittal information shall be provided and development standards met:

(1) An application for a special exception approval for a[] . . . gas operation which involves a[] . . . natural gas well, . . . shall be filed with the Director of Community Development along with the required administrative fee and such application shall include information as outlined and processed as follows:

* * *

(c) Disclose the special exception for which the application is being made, and show how the property, as it may be improved, meets the standards and criteria required for approval.

(d) Upon receipt of such application for special exception, the Director of Community Development shall forthwith refer the same to the [Board]. The application for special exception shall be processed as per the provisions of [Section 913.2 of] the Pennsylvania Municipalities Planning Code [(MPC), Act of July 31, 1968, P.L. 805, *as amended*, added by the Act of December 21, 1988, P.L. 1329, 53 P.S. §10913.2,] and §190-906 of this chapter.

* * *

(f) The [Board] may authorize a special exception pursuant to express standards and criteria specified in this chapter for said uses and may attach such additional conditions and safeguards as it may deem necessary where such conditions and safeguards are

**(Footnote continued on next page…)**

(RR) Zoning District.[4]   Applicant entered into a lease with the owners of the property on August 20, 2014, for oil, gas, and other minerals present therein.  The following facts were found by the Board following a number of hearings on the application for a special exception.

The development will cover approximately 32 acres of the parcel, with an area of disturbance of 16.9 acres, and the Metis Well Pad will be 350 feet by 500 feet located on the western portion of the property.  The site location meets the setback requirements of the Zoning Ordinance, with the exception of one adjoining parcel, which is within the 200-foot property line setback.  However, Applicant has secured a waiver from the adjoining property owner as required by the Township's Zoning Ordinance.

---

**(continued…)**

> not pre-empted by [the Oil and Gas Act] as determined by Pennsylvania courts.

> D. The applicant shall demonstrate that the drill site operations will not violate the citizens of Penn Township's right to clean air and pure water as set forth in Art[icle] 1, Sec[tion] 27, of the Pennsylvania Constitution[.]  The applicant shall have the burden to demonstrate that its operations will not affect the health, safety or welfare of the citizens of Penn Township or any other potentially affected landowner.  The application submitted shall include reports from qualified environmental individuals attesting that the proposed location will not negatively impact the Township residents' environmental rights; and will include air modelling and hydrogeological studies as potential pathways that a spill or release of fluid may follow.

[4] Section 190-402 of the Township's Zoning Ordinance defines the purpose of the RR Zoning District as, "to provide land for continuing agricultural operations, resource management, timber harvesting, outdoor recreation, public and private conservation areas, low-density single-family residential, and compatible support uses."

The well site will be reached by taking U.S. Route 22 south on Harrison City-Export Road to a 1,280-foot access road. Harrison City-Export Road is a Westmoreland County-maintained road for the portion located in the Township and is maintained by the Municipality of Murrysville for a short distance from the Township line to U.S. Route 22. No Township roads will be used by Applicant for any purpose throughout the development project.

Applicant intends to drill up to 10 unconventional gas wells at the site in an initial 7- to 10-month development period. Construction operations will occur during daylight hours with heavy equipment remaining on site during that period. Approximately 7 to 10 truckloads of stone will be brought to the site per hour to construct the access road and the pad over a 7- to 10-day period.

The drilling phase will take 20 to 25 days per well for 24 hours a day. The initial drilling phase will involve a short-term, several-day increase in heavy traffic volume, which will peak at approximately 10 vehicles per hour. Once the wells are open, the fracking segment of the completion phase will cause a second increase in heavy vehicle traffic to bring the relevant equipment to the site. This will involve sand truck traffic at 25 vehicles per day for the 7- to 10-day fracking period for each well. Applicant intends to introduce a dust control protocol to dispense fracking sand that will involve the creation of vacuums to minimize the accidental release of sand or dust generated by the process. Truck trips to the site will reduce significantly during the actual drilling operations, primarily involving vehicles transporting well casings and cement trucks used for the casing installation.

The chemicals stored onsite will include drilling mud, friction reducer, and the chemicals used in the fracking process, which will be protected

6

with secondary containment in addition to their primary containers. The chemicals will be removed from the site once the drilling and completion phases are over.

Wastewater, also known as "flowback" or "produced" water, will be collected during the completion phase in a 500-barrel "lay-down" tank. No wastewater treatment will occur on site and will be removed by trucks to be reused at other well sites or transported to an approved treatment facility. Produced water removal will require 15 to 20 trucks per day for approximately 30 days when the volume required for disposal will decrease to a few trips per day and then to a few per month during the production life of the site.

Applicant submitted Air and Hydrogeologic Reports prepared by Morris Knowles, Civil Engineering Consultants, and Trinity Consulting, regarding accidental releases of fluids and accompanying emissions with respect to the constitutional requirements referenced in Section 190-641(D) of the Township's Zoning Ordinance governing the Township citizens' right to clean air and water. *See* Reproduced Record (R.R.) at 725a-753a. The Board accepted Nathan Garlitz of Morris Knowles and Thomas Walsh of Trinity Consulting as experts. Garlitz and Walsh completed the Reports and each study presumed a catastrophic failure of containment on the site, which is a rare event, and indicated the pathways such a release would follow. Their studies found that no reasonable groundwater pathways for a spill or release of fluid at the site would generate a risk of toxic exposure to the surrounding area including groundwater sources.

Applicant also offered the testimony of Jennifer Hoffman, its Vice President of Health, Safety and Regulatory Procedures. She testified that the flowback water and produced water are regulated liquids that DEP classifies as "Residual Waste" as provided in the Solid Waste Management Act (SWMA), Act

7

of July 7, 1980, P.L. 380, *as amended*, 35 P.S. §§6018.101-6018.1003. She stated that these fluids are not considered to be "hazardous wastes" as defined in Section 103 of the SWMA,[5] and are consistent with brine or saltwater. Likewise, Walsh, of Trinity Consulting, stated that a release of wastewater would act no differently than a similar volume of freshwater. Hoffman also outlined Applicant's Radiation Monitoring Plan at its sites to deal with potential radioactive materials that are the byproduct of the development process. *See* R.R. at 754a-788a.

Applicant also offered the testimony of Ian Donaldson of Trinity Consulting, who was accepted by the Board as an expert in air dispersion modeling. He conducted air dispersion modeling using the United States Environmental Protection Agency (EPA) AERSCREEN model, a single-source model using a wide array of meteorological data and downwind receptors. *See* R.R. at 789a-792a. He determined that the evaporative emission rates associated

---

[5] 35 P.S. §6018.103. Section 103 of the SWMA defines "Residual Waste," in relevant part, as "[a]ny garbage, refuse, other discarded material or other waste including solid, liquid, semisolid, or contained gaseous materials resulting from industrial, mining and agricultural operations." In turn, Section 103 defines "Hazardous Waste," in pertinent part, as:

> Any . . . discarded material including solid, liquid, semisolid or contained gaseous material resulting from . . . commercial, industrial, [or] mining . . . operations, . . . which because of its quantity, concentration, or physical [or] chemical . . . characteristics may:
>
> (1) cause or significantly contribute to an increase in mortality or an increase in morbidity in either an individual or the total population; or
>
> (2) pose a substantial present or potential hazard to human health or the environment when improperly treated stored, transported, disposed of or otherwise managed.

with the several onsite liquids were less than any short-term benchmarks indicating a hazard to public health, safety, or welfare.

Finally, Applicant offered the testimony and report of Dr. Christopher Long (Long), a Board Diplomate toxicologist with doctoral degrees in Chemistry, Environmental Engineering, and Environmental Health. He was accepted by the Board as an expert in these fields, and testified that he routinely prepares analyses and renders opinions regarding human health risks in his position with Gradient, an environmental consulting firm. He testified regarding the potential health effects from unconventional gas wells, basing his opinion on peer-approved studies, empirical government datasets, government reports, and commissioned studies regarding air quality impacts in the Marcellus Shale region, including air monitoring data collected near oil and gas drilling operations in the region. He testified, within a reasonable degree of scientific certainty, that the data compiled in a large body of monitoring studies concerning air quality and the potential for harm from unconventional gas well drilling does not support claims that public health concerns exist through normal and typical operations.

Objector presented the testimony of Dr. Walter Tsou (Tsou), an M.D. with a bachelor's degree in Chemistry and a master's degree in Public Health, and the Executive Director of Physicians for Social Responsibility, as an expert in public health issues, whose testimony from the Gaia Well Pad proceedings was incorporated by stipulation into these proceedings. *See* R.R. at 685a. Tsou was the author of a resolution adopted by the Pennsylvania Medical Society urging a moratorium on unconventional gas and oil development in the Commonwealth. He expressed general concerns regarding the lack of baseline information that would assist in determining the public health impact generated by unconventional

9

gas drilling based on his review of surveys analyzing information that was primarily self-reported by individuals near unconventional gas well sites.

Objector also presented the testimony of Laura Dagley, R.N., who currently serves as the Medical Advocacy Coordinator for Physicians for Social Responsibility and was offered as an expert in Public Health issues as they relate to unconventional gas wells. She reviewed the application, public health literature, Tsou's testimony from prior hearings and other materials. She submitted a multi-page report to the Board. *See* R.R. at 667a-678a. She stated that based on her review of surveys that analyzed information that was primarily self-reported by individuals near unconventional gas well sites, that the proposed development would have negative public health impacts due to the proximity of residential and recreational areas.

Objector also presented the testimony of Dr. Lawrence Irr, who has a doctoral degree in Chemistry, and has completed post-doctoral work in engineering and was accepted by the Board as an expert in Chemistry and the safe handling of chemical substances. He expressed concerns regarding the manner of storage of hazardous chemicals at the site, the lack of information regarding the materials used to construct storage vessels and the containment protocol for the Metis Well Pad Site. *See* R.R. at 679a-684a. He also expressed concerns regarding releases of these chemicals along with Applicant's protocol for handling radioactive materials that would result onsite from the development process.

On May 10, 2018, the Board issued a decision disposing of the application to develop unconventional gas wells at the Metis Well Pad Site. *See* R.R. at 629a-666a. Contrary to Objector's assertion, the Board concluded, "The accumulation and temporary storage of wastewater, which includes flowback and

produced water, at the site throughout all phases of development, including the long-term production phase, does not violate the provisions of Section 190-635 precluding the unenclosed storage of flammable, hazardous or toxic fluids of more than 500 gallons." *Id.* at 651a. The Board also concluded that "Applicant, in its application and through evidence submitted at the time of hearing . . . has satisfied the conditions of Article VI, §190-641(B) [of the Zoning Ordinance]," and "has provided an adequate description of the property location, proposed use of the site and met other requirements as set forth in Article VI, §190-641(C)." *Id.*

> Further, the Board concluded:

> The normal operations associated with the proposed use, while presumed consistent with health, safety and welfare, also creates issues of excessive lighting, noise and some air quality issues, especially during the period f 24-hour periods of operation that have been demonstrated to interfere with the general welfare of the surrounding residents, requiring the imposition of certain conditions.

R.R. at 651a. Nevertheless, the Board concluded that "Applicant has produced evidence to show that its operation, subject to certain conditions, will satisfy the requirements of Article VI, §190-641(D) of the Ordinance and Article I, Section 27 of the Pennsylvania Constitution," and that Objector "failed to establish sufficient, credible evidence that if [] Applicant has been found to have met the Ordinance requirements and the application is granted, with conditions, that the said use would create a high probability that an adverse, abnormal or detrimental effect will occur to public health, safety and welfare." *Id.* at 652a.

Accordingly, the Board issued the decision granting the application for a special exception subject to a number of conditions. R.R. at 653a-655a. Objector appealed the Board's decision to the trial court, which affirmed the

11

decision without taking additional evidence. Objector then filed the instant appeal of the trial court's order.[6]

In this appeal, Objector raises the same claims as were raised in its appeal in *Protect PT v. Penn Township Zoning Hearing Board* (Pa. Cmwlth., No. 575 C.D. 2019, filed July 6, 2020) (*Protect PT*), relating to the Board's grant of Applicant's application for a special exception to develop unconventional gas wells at its Gaia Well Pad site in the Township, subject to a number of conditions. Accordingly, we affirm the trial court's order based upon our disposition of Objector's claims in *Protect PT*.[7]

 

 

_____
MICHAEL H. WOJCIK, Judge

---

[6] Because the parties presented no additional evidence to the trial court, our review is limited to determining whether the Board committed an abuse of discretion or an error of law. *Taliaferro v. Darby Township Zoning Hearing Board*, 873 A.2d 807, 811 n.1 (Pa. Cmwlth. 2005) (citation omitted).

[7] *See* Section 414(a) of this Court's Internal Operating Procedures, 210 Pa. Code §69.414(a) ("Parties may also cite an unreported panel decision of this court issued after January 15, 2008, for its persuasive value, but not as binding precedent.").

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Protect PT,                                     :
                                                :
                        Appellant               :
                                                :
            v.                                   : No. 576 C.D. 2019
                                                :
Penn Township Zoning Hearing                     :
Board and Olympus Energy LLC                     :

# O R D E R

AND NOW, this 6<u>th</u> day of <u>July</u>, 2020, the order of the Westmoreland County Court of Common Pleas dated April 9, 2019, is AFFIRMED.

_____
MICHAEL H. WOJCIK, Judge

Protect PT,                                    :
                    Appellant              :
                                               :       No. 576 C.D. 2019
              v.                            :
                                               :       Argued:  February 13, 2020
Penn Township Zoning Hearing       :
Board and Olympus Energy LLC     :


BEFORE:    HONORABLE PATRICIA A. McCULLOUGH, Judge
                  HONORABLE MICHAEL H. WOJCIK, Judge **(P.)**
                  HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge


## *OPINION NOT REPORTED*

CONCURRING OPINION
BY JUDGE McCULLOUGH                                    FILED:  July 6, 2020


I concur in the result reached by the Majority because faithful adherence to our prevailing precedent compels it.  *See generally Protect PT v. Penn Township Zoning Hearing Board*, 220 A.3d 1174 (Pa. Cmwlth. 2019); *Frederick v. Allegheny Township Zoning Hearing Board*, 196 A.3d 677 (Pa. Cmwlth. 2018) (en banc), *appeal denied*, 208 A.3d 462 (Pa. 2019).  I do so reluctantly, though, based upon the reasoning that I have previously expressed with regard to the fundamental issues, underlying premises, and legal conclusions that constitute that prevailing precedent.

Overall, the oil and gas industry is a longstanding, integral, and important business to the residents of Pennsylvania.  My concern, however, is that judicial review in matters such as the one presently before the Court has been

severely reduced to a point where this Court functions merely to ascertain whether a zoning hearing board found the objector's evidence credible. Here, Protect PT (Objector) presented both layperson and expert testimony. Most significantly, one expert based his opinion on peer review literature and an analysis of the specific details of the Metis Well Pad construction and its capabilities and opined that the Township and its residents would suffer detrimental harm. *See* Reproduced Record (R.R.) at 667a-82a.

I do not in any way—and I emphasize *any*—suggest that the Penn Township Zoning Hearing Board (or any board) has not, cannot, and will not assume and fulfill their tremendous responsibility as a fact finder in the most honorable and principled manner. My concern, instead, lies in the legal framework employed to address, analyze, and dispose of the issues discussed above.

Having made these observations, I respectfully concur in the result reached by the Majority.

_____
PATRICIA A. McCULLOUGH, Judge